# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 22, 2019       Decided December 29, 2020

No. 18-5305

CAROLYN MALONEY, ET AL.,
APPELLANTS

v.

EMILY W. MURPHY, ADMINISTRATOR, GENERAL SERVICES
ADMINISTRATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02308)

*David C. Vladeck* argued the cause for appellants. With him on the briefs were *Stephanie Glaberson*, *Scott L. Nelson*, and *Allison M. Zieve*.

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Mark R. Freeman*, *Scott R. McIntosh*, and *Jeffrey E. Sandberg*, Attorneys.

Before: TATEL and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Senior Circuit Judge* GINSBURG.

MILLETT, *Circuit Judge*:  Federal law expressly authorizes seven or more members (less than a majority) of the House of Representatives' Committee on Oversight and Reform to request and to receive information from government agencies as relevant to the performance of their Committee duties.  *See* 5 U.S.C. § 2954.   In 2017, the Ranking Member of the Committee and seven other members sent such a request to the General Services Administration seeking information related to property owned by the United States government.   The agency refused to comply.

The sole question before the court is whether the members who requested agency information under Section 2954 have standing under Article III to enforce their statutorily conferred right to information.  We hold that they do.  Informational injuries have long satisfied the injury requirement of Article III.  A rebuffed request for information to which the requester is statutorily entitled is a concrete, particularized, and individualized personal injury, within the meaning of Article III.  That traditional form of injury is quite distinct from the non-cognizable, generalized injuries claimed by legislators that are tied broadly to the law-making process and that affect all legislators equally.   And nothing in Article III erects a categorical bar against legislators suing to enforce statutorily created informational rights against federal agencies, whether under the Freedom of Information Act, 5 U.S.C. § 552, or under Section 2954.  Because the plaintiffs have standing, we reverse the district court's dismissal of the case and remand for further proceedings.

**I**

**A**

Under Section 2954 of Title 5, committee members on the House and Senate committees dedicated to governmental oversight may request and receive information from federal agencies that pertains to those members' committee work. Section 2954 provides in full:

> An Executive agency, on request of the Committee on Government Operations of the House of Representatives [now the Committee on Oversight and Reform], or of any seven members thereof, or on request of the Committee on [Homeland Security and] Governmental Affairs of the Senate, or any five members thereof, shall submit any information requested of it relating to any matter within the jurisdiction of the committee.

5 U.S.C. § 2954.

At the time of Section 2954's passage, the relevant House committee had 21 members, thirteen from the majority party and eight from the minority. *See* 1 DAVID CANON ET AL., COMMITTEES IN THE U.S. CONGRESS, 1789–1946: HOUSE STANDING COMMITTEES 497 (2002). Section 2954's terms specifically empower not just the full committees, but also a smaller, non-majority group of committee members (seven in the House and five in the Senate) to request needed information from federal agencies.

As now constituted, the two committees covered by Section 2954 are uniquely focused on governmental oversight and accountability. The Committee on Oversight and Reform of the House has relatively broad jurisdiction over, among

other things, "[g]overnment management and accounting measures generally"; "[o]verall economy, efficiency, and management of government operations and activities, including Federal procurement"; and "[p]ublic information and records." House Rule X, cl. 1(n). The Committee on Homeland Security and Governmental Affairs of the Senate has jurisdiction over similar subjects, including "[b]udget and accounting measures" and "[g]overnment information." Senate Rule XXV, cl. 1 (k)(1).

Section 2954 was enacted in 1928 in the wake of the Supreme Court's landmark decision in *McGrain v. Daugherty*, 273 U.S. 135 (1927). Suspecting that the Attorney General of the United States had failed to prosecute specific individuals who had violated the antitrust laws, the Senate formed a select committee to investigate the matter. That committee's investigative powers included issuing subpoenas to witnesses. *Id.* at 151–152. When a witness refused to comply and challenged Congress's right to call individuals to testify, the Court affirmed that Congress's "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *Id.* at 174. Such power was necessary to effective governance because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *Id.* at 175.

Against that backdrop, Congress passed Section 2954, and the President signed it into law. Previously, 128 different statutes scattered across the United States Code had obligated certain federal agencies to submit periodic reports and information to Congress. *See* Act of May 29, 1928, Pub. L.

No. 70-611, 45 Stat. 986, 986–996. Congress repealed those mandatory reporting requirements and replaced them with Section 2954, ensuring that legislators serving on the two committees directly responsible for government oversight could more effectively and more timely receive the information from federal agencies that is necessary and useful to their performance of their legislative duties. *See id.* at 996; *see also* H.R. REP. NO. 1757, 70th Cong., 1st Sess. 3, 6 (1928); *id.* at 6 ("To save any question as to the right of the House of Representatives to have furnished any of the information contained in the reports proposed to be abolished, a provision has been added to the bill requiring such information to be furnished to the Committee on Expenditures in the Executive Departments *or* upon the request of any seven members thereof.") (emphasis added).

Section 2954 is distinct from Congress's institutional authority to request or subpoena documents and witnesses. Those measures require formal authorization by Congress, a Chamber of Congress, or a committee. But an information request under Section 2954 can be made by just a small group of legislators—a true minority—who make the individual judgment to seek the information as a means of better informing their committee work. As both the House and Senate Reports explained: "If any information is desired by any Member or committee upon a particular subject that information can be better secured by a request made by an individual Member or committee, so framed as to bring out the special information desired." H.R. REP. NO. 1757, at 6; S. REP. NO. 1320, 70th Cong., 1st Sess. 4 (1928).[1]

---

[1] The tradition of federal agencies providing information to Congress dates back to at least the Treasury Act of 1789, which made it "the duty of the Secretary of the Treasury * * * to make report, and give information to either branch of the legislature, in person or in

**B**

In February 2017, the then–House Oversight Committee Ranking Member, Representative Elijah Cummings, and seven other members of the House Oversight Committee (collectively, "Requesters"), issued a Section 2954 request for information to the General Services Administration ("GSA") after the agency had repeatedly rebuffed their efforts to obtain the information voluntarily.[2]

The Requesters' inquiry has its origin in the GSA's 2013 lease of the Old Post Office building in Washington, D.C., to Trump Old Post Office LLC ("Company"), a business owned by the now-President Donald Trump and his children. The lease agreement explicitly barred any federal or District of Columbia elected official from participating in or benefiting from the lease:

> No member or delegate to Congress, or elected official of the Government of the United States or the Government of the District of Columbia, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom.

---

writing (as he may be required), respecting all matters referred to him by the Senate or House of Representatives, or which shall appertain to his office." Act of Sept. 2, 1789, ch. 12, § 2, 1 Stat. 65, 65–66.

[2] During the pendency of this appeal, Representative Cummings passed away. *See* Notice Pursuant to Federal Rule of Appellate Procedure 43(a), *Maloney v. Murphy*, No. 18-5305 (D.C. Cir. Oct. 21, 2019). The seven other requesting members have continued to prosecute this action. *Id.*

J.A. 11, Compl. ¶ 11 (quoting Article 37.19 of the lease agreement).[3]

In November 2016, following President Trump's election, Representative Cummings and three other Committee members requested that the GSA provide a briefing on the lease, as well as unredacted copies of lease documents and the Company's monthly and annual statements. After the request was again made by Representative Cummings and ten other Committee members, invoking Section 2954, the GSA produced records including lease amendments, a 2017 budget estimate, and monthly income statements. The GSA stated that it was releasing the information "[c]onsistent with [Section 2954.]" J.A. 87.

In January 2017, following President Trump's inauguration, Representative Cummings and three other Committee members requested additional information from the GSA relating to the agency's enforcement of the lease terms. Specifically, they asked the GSA

(a) to explain the steps that GSA had taken, or planned to take, to address President Trump's apparent breach of the lease agreement;

(b) to state whether GSA intended to notify President Trump's company that it is in breach;

(c) to provide the monthly reports President Trump's company submits to the GSA on the Trump International Hotel's revenues and expenses;

---

[3] At this stage, we "assume the truth of the plaintiff[s'] material factual allegations." *Blumenthal v. Trump*, 949 F.3d 14, 18 (D.C. Cir. 2020).

(d) to explain and provide documentation of the steps GSA had taken, or planned to take, to address liens against the Trump International Hotel; and

(e) to provide copies of all correspondence with representatives of President Trump's company or the Trump transition team.

J.A. 13–14, Compl. ¶ 19.

The GSA refused to comply with that request, stating that the Committee members should submit a request under Section 2954. *See* J.A. 95.

The Requesters took the GSA up on its offer. By letter dated February 8, 2017, Ranking Member Cummings and seven other Committee members formally invoked Section 2954 in support of their information request. The Requesters asked for a response by February 13, 2017.

The GSA did not respond. After submitting a number of follow-up inquiries, the Requesters sent a lengthier letter explaining the background and function of Section 2954. On July 6, 2017, the Requesters reiterated their informational inquiry in a third formal communication to the GSA, again invoking Section 2954.

Finally, in July 2017, the GSA rejected those three formal requests in a one-page letter. The letter expressed the agency's view that "[i]ndividual members of Congress, including ranking minority members, do not have the authority to conduct oversight in the absence of a specific delegation by a full house, committee, or subcommittee." The letter did not mention Section 2954.

**C**

The Requesters filed suit in November 2017 against the then–Acting Administrator of the GSA, asserting that the agency's refusal to comply with the statute "deprived the plaintiffs of information to which they are entitled by law[.]" J.A. 18. The Requesters asserted that the refusal thwarted each Member's ability to:

(a) evaluate the propriety of GSA's failure to enforce Article 37.19 of the lease which, by its express terms, forbids President Donald Trump, an "elected official of the Government of the United States," from benefiting from the lease in any way;

(b) evaluate GSA's oversight of the lease, including financial management of the lease;

(c) ascertain the amount of income from the lease benefiting President Trump, his daughter Ivanka Trump, and his sons Donald, Jr. and Eric Trump;

(d) determine the extent to which Trump Old Post Office LLC has received funds from foreign countries, foreign entities, or other foreign sources;

(e) assess whether GSA's failure to act is based on a new interpretation of Article 37.19 of the lease, and if so, to review the legal opinion or opinions on which the new interpretation is based;

(f) evaluate whether the GSA contracting officer's decision that the Trump Old Post Office LLC is in compliance with the lease was free from inappropriate influence; and

(g) recommend to the Committee, and to the House of Representatives, legislative and other actions that should be taken to cure any existing conflict of interest, mismanagement, or irregularity in federal contracting.

J.A. 18–19, Compl. ¶ 36.

The Requesters filed a motion for summary judgment on the ground that Section 2954 entitled them to the information sought as a matter of law. *Cummings v. Murphy*, 321 F. Supp. 3d 92, 96 (D.D.C. 2018). The GSA, for its part, filed a motion to dismiss arguing that (i) the Requesters, as individual legislators, lacked Article III standing; (ii) Section 2954 does not provide a cause of action for enforcement; (iii) principles of equitable discretion required dismissal; and (iv) Section 2954 does not apply to the information sought. *Id.* at 100.

The district court dismissed the case for lack of standing. The court reasoned that, in *Raines v. Byrd*, 521 U.S. 811 (1997), the Supreme Court established "a binary rubric of potential injuries for purposes of assessing [the] standing" of individual legislators as either "institutional" or "personal." *Cummings*, 321 F. Supp. 3d at 107. The district court then ruled that the Requesters' injury was not personal because they were not "singled out for specially unfavorable treatment," and the injury was not to a private right. *Id.* at 109 (quoting *Raines*, 521 U.S. at 821). The district court also held that the injury was not institutional because no subpoena was involved, and Section 2954 had rarely led to litigation over its enforcement. *Cummings*, 321 F. Supp. 3d at 113–114.

Having dismissed the case on standing grounds, the district court did not address the other grounds for dismissal pressed by the GSA.

The Requesters timely filed a notice of appeal.

**II**

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 to evaluate its own jurisdiction in this case. We have jurisdiction to review the judgment of dismissal under 28 U.S.C. § 1291.

We review questions of standing *de novo*. *Blumenthal v. Trump*, 949 F.3d 14, 18 (D.C. Cir. 2020). In doing so, we accept as true the plaintiffs' material factual allegations, *id.*, and, to the extent it bears on the standing inquiry, we assume that the Requesters would prevail on the merits of their lawsuit, *Committee on the Judiciary, U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc).

**III**

**A**

The Constitution vests limited powers in each branch of the federal government. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–1547 (2016). Congress is entrusted with enumerated "legislative Powers," U.S. CONST. Art. I, § 1, the President with "[t]he executive Power," *id.* Art. II, § 1, cl. 1, and the federal courts with "[t]he judicial Power of the United States," *id.* Art. III, § 1.

"[T]o remain faithful to this tripartite structure," the judicial power "may not be permitted to intrude upon the powers given to the other branches." *Spokeo*, 136 S. Ct. at 1547. To that end, the Constitution confines the judicial power "only to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. CONST. Art. III, § 2). Embedded in that "case-or-controversy requirement" is the obligation of plaintiffs who seek to invoke

the jurisdiction of a federal court to establish their standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also McGahn*, 968 F.3d at 762 ("The standing inquiry is trained on whether the plaintiff is a proper party to bring a particular lawsuit.") (formatting modified).

To establish Article III standing, a plaintiff must allege "(1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). To satisfy the first prong, a party's complaint "must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized to him." *Raines*, 521 U.S. at 819. "In this manner does Art[icle] III limit the federal judicial power to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

Given that "the law of [Article] III standing is built on * * * the idea of separation of powers[,]" "our standing inquiry has been especially rigorous" when the suit pits members of the two Political Branches against each other. *Raines*, 521 U.S. at 820–821 (formatting modified); *see McGahn*, 968 F.3d at 763, 769–772 (analyzing the question of standing with "rigor" in a case involving a clash between Congress, a former Executive Branch official, and the Executive). Nonetheless, "the Judiciary has a responsibility to decide cases properly before it[.]" *Zivotofsky ex. rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–195 (2012) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). "Courts cannot avoid their responsibility merely because the issues have

political implications." *Id.* at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)); *see also McGahn*, 968 F.3d at 774 (same).

**B**

The agency's failure to provide information to which the Requesters are statutorily entitled is a quintessential form of concrete and particularized injury within the meaning of Article III.

The Supreme Court has repeatedly held that informational injuries satisfy the injury-in-fact requirement. In *FEC v. Akins*, 524 U.S. 11 (1998), the plaintiffs filed suit against the Federal Election Commission based on the Commission's failure to require a political committee to release information as required by the Federal Election Campaign Act of 1971, 52 U.S.C. § 30101 *et seq*. *See* 524 U.S. at 14, 20–21. The Supreme Court held that the plaintiffs' "inability to obtain information * * * that, on [the plaintiff's] view of the law, [a] statute requires" is a "concrete and particular" injury. *Id*. at 21.

Likewise, in *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 449 (1989), a plaintiff sought information under the Federal Advisory Committee Act's disclosure provision, 5 U.S.C. App. II, § 10(b). *See* 491 U.S. at 449–450. The Supreme Court ruled that the plaintiff had standing. "As when an agency denies requests for information under the Freedom of Information Act," the Supreme Court explained, the "refusal to permit [plaintiffs] to scrutinize * * * activities to the extent the [Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue." *Id*. at 449; *see also Spokeo*, 136 S. Ct. at 1549–1550 (plaintiffs in cases like *Public Citizen* and *Akins* "need not allege any *additional* harm beyond the one Congress has identified").

Our precedent follows suit. As we recently reaffirmed *en banc*, "the denial of information to which the plaintiff claims to be entitled by law establishes a quintessential injury in fact." *McGahn*, 968 F.3d at 766 (citing *Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008)); *see also Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (holding that Section 10(c) of the Endangered Species Act, 16 U.S.C. § 1539(c), "create[d] a right to information upon which a claim of informational standing may be predicated"); *Zivotofsky ex. rel. Ari Z. v. Secretary of State*, 444 F.3d 614, 617 (D.C. Cir. 2006) (Under FOIA, "[t]he requestor is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive."); *cf. In re Committee on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 622 (D.C. Cir. 2020) (Rao, J., dissenting) ("Because [the Federal Election Campaign Act of 1971 and the Federal Advisory Committee Act] created affirmative disclosure obligations, a plaintiff could establish an Article III injury by alleging a refusal to provide the required information.").

Cases under the Freedom of Information Act, 5 U.S.C. § 552, and the Government in the Sunshine Act, *id.* § 552b, drive the point home. Supreme Court "decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records" to establish standing. *Public Citizen*, 491 U.S. at 449; *see also Zivotofsky*, 444 F.3d at 617–618. Under those statutes, "[a]nyone whose request for specific information has been denied has standing to bring an action[.]" *Zivotofsky*, 444 F.3d at 617. "[T]he requester's circumstances—why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose—are irrelevant to his standing." *Id.*; *see also Prisology, Inc. v. Federal Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017) (stating that a "requester has

suffered a particularized injury because he has requested and been denied information Congress gave him a right to receive").

The language of Section 2954 mirrors the operative provisions in those statutes and cases. Section 2954 requires, as relevant here, that, upon a request by at least seven members of an oversight committee, "[a]n Executive agency * * * shall submit any information requested of it relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954.

The Freedom of Information Act analogously commands that "[e]ach agency, upon any request for records[,] * * * shall make the records promptly available to any person[.]" 5 U.S.C. § 552(a)(3)(A)); *see Zivotofsky*, 444 F.3d at 617; *see also* Privacy Act, 5 U.S.C. § 552a(d)(1) (An agency, "upon request by any individual to gain access to his record or to any information pertaining to him," must "permit him * * * to review the record and have a copy made of all or any portion thereof[.]"); *Sussman v. United States Marshals Serv.*, 494 F.3d 1106, 1121 (D.C. Cir. 2007) (suit under the Privacy Act by individual whose request for information from the agency had been denied).

Likewise, the Federal Advisory Committee Act at issue in *Public Citizen* requires that enumerated records of advisory committees "shall be available for public inspection[.]" 5 U.S.C. App. II, § 10(b); *see Public Citizen*, 491 U.S. at 446–447. The Federal Election Campaign Act provision at issue in *Akins* similarly provided that "each report under [the statutory] section shall disclose" to the public certain enumerated information. 2 U.S.C. § 434(b) (1997) (now codified at 52 U.S.C. § 30104(b)); *see Akins*, 524 U.S. at 15. And under the Endangered Species Act, "[i]nformation received by the Secretary as a part of any application shall be available to the

public as a matter of public record at every stage of the proceeding." 16 U.S.C. § 1539(c); *see Friends of Animals*, 824 F.3d at 1041.

The right to request information under Section 2954 is on all fours, for standing purposes, with the informational right conferred by those other statutes. Also like FOIA, Section 2954's informational right is meant to empower individuals to better "know 'what their government is up to.'" *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (internal quotation marks omitted) (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)); *cf.* H.R. REP. NO. 1757, at 6 (Under Section 2954, "[i]If any information is desired by any Member or committee upon a particular subject that information can be better secured by a request made by an individual Member or committee, so framed as to bring out the special information desired."); S. REP. NO. 1320, at 4 (same). And the agency's deprivation of the information to which requesters are statutorily entitled creates an Article III injury here for the same reasons it did in *Akins*, 524 U.S. at 21, *Public Citizen*, 491 U.S. at 448–449, *Friends of Animals*, 824 F.3d at 1042, and *Zivotofsky*, 444 F.3d at 617.

That injury in fact is also concrete and particularized, as Article III requires, *see Spokeo*, 136 S. Ct. at 1548. In statutory informational injury cases, a plaintiff must allege that "it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it," and that "it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

The Requesters have alleged just that. First, the Requesters have identified a deprivation of information that, on their reading of the statute, they are legally entitled to receive. The deprivation is accomplished and complete, and the absence of information has been and continues to be felt by the Requesters. As the Supreme Court has recognized numerous times, that denial works a concrete injury. *See Spokeo*, 136 S. Ct. at 1549–1550 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete," citing as examples of cognizable intangible injuries the agencies' failure to provide information in *Akins* and *Public Citizen*).

Second, the Requesters have alleged that the withholding of information has affected each of them "in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). Section 2954 confers its informational right directly on these specific legislators so that they personally can properly perform their roles on the oversight committees. In denying their requests for information due to them under that statute, J.A. 16, Compl. ¶ 27, the GSA "thwart[ed]" their individual ability to understand what the GSA is up to with respect to the Old Post Office lease. *See* J.A. 18–19, Compl. ¶ 36.

In sum, ample precedent establishes that the statutory informational injury alleged by the Requesters here amounts to a concrete and particularized injury in fact for purposes of Article III standing.

18

**C**

**1**

The GSA does not question that established body of standing law governing informational injuries. Nor does the GSA dispute that Section 2954 creates a statutory right on the part of the Requesters to seek and to obtain information from federal agencies. And the GSA agrees that Members of Congress suffer informational injuries when they are denied information that they are statutorily entitled to seek from federal agencies under similar laws like the Freedom of Information Act. Oral Arg. Tr. 26 ("[W]e're not disputing that the Plaintiffs can invoke FOIA.").

The GSA's position, instead, is that an informational injury under Section 2954 does not count for Article III purposes simply because that statute vests the informational right only in legislators.

That is not how Article III's injury-in-fact requirement works. For starters, remember, the point of Article III's standing requirement is to ensure that there is a "case or controversy" for the federal court to resolve, U.S. CONST. Art. III, § 2. *See Spokeo*, 136 S. Ct. at 1547 ("Although the Constitution does not fully explain what is meant by '[t]he judicial Power of the United States,' it does specify that this power extends only to 'Cases' and 'Controversies[.]'") (first quoting U.S. CONST. Art. III, § 1, then quoting *id.* Art. III, § 2). By demonstrating (i) an injury in fact in the form of the deprivation of information to which the plaintiffs are statutorily entitled (ii) that is concrete and particularized to the Requesters themselves and them alone, (iii) that was caused by the agency's refusal to provide the information, and (iv) that would be redressed by a judicial order to provide the information, a case or controversy has been joined here, just as directly and

completely as it has in countless other informational injury cases. It is no different for standing purposes than if these same Requesters had filed a FOIA request for the same information.

In addition, in analyzing the standing of legislators, cases have traditionally asked whether the asserted injury is "institutional" or "personal." An institutional injury is one that belongs to the legislative body of which the legislator is a member. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) ("The Arizona Legislature * * * [was] an institutional plaintiff asserting an institutional injury[.]"); *see also Bethune-Hill*, 139 S. Ct. at 1953 ("[I]ndividual members lack standing to assert the institutional interests of a legislature[.]"). Such institutional injuries afflict the interests of the legislature as an entity; they do not have a distinct personal, particularized effect on individual legislators.

A personal injury, by contrast, refers to an injury suffered directly by the individual legislators to a right that they themselves individually hold. A personal injury to a legislator, for Article III purposes, is not limited to injuries suffered in a purely private capacity, wholly divorced from their occupation. Rather, in the context of legislator lawsuits, an injury is also "personal" if it harms the legal rights of the individual legislator, as distinct from injuries to the institution in which they work or to legislators as a body. *See Powell v. McCormack*, 395 U.S. 486, 493 (1969) (reviewing legislator's claim that he was inappropriately barred from taking his seat and from receiving his pay); *see also Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016) (stating that, if a subset of legislators was barred from voting, members of the subset "could claim a personal injury"); *cf. Coleman v. Miller*, 307 U.S. 433, 438 (1939) (although asserting an institutional injury,

legislators had standing because their individual "votes * * * ha[d] been overridden and virtually held for naught").[4]

The GSA's argument, like the Dissenting Opinion, fundamentally confuses those categories by adopting a sweeping definition of institutional injury that would cut out of Article III even those individualized and particularized injuries experienced by a single legislator alone. The GSA tries to ground its overly broad definition of institutional injury in the Supreme Court's decision in *Raines*.

But *Raines* was quite different. In that case, six Members of Congress who had voted against passage of the Line Item Veto Act filed suit to challenge the constitutionality of the statute after they were outvoted. 521 U.S. at 814. The Line Item Veto Act gave the President the authority to cancel spending or tax measures after they were passed by both Chambers of Congress and signed into law. *Id.* (citing Pub. L. No. 104-130, 110 Stat. 1200 (1996)). The legislators asserted as injuries the alteration in the balance of powers between the Executive and Congress caused by the law, the supplanting of Congress's veto power, and diminution of the effectiveness of legislative votes. *Raines*, 521 U.S. at 816 (quoting Individual Legislators' Compl. ¶ 14).

---

[4] The statute requires that six other Committee members (less than a Committee majority) support the request, thereby preventing harassing or idiosyncratic uses of Section 2954. *See* Dissenting Op. 10–11. That additional requirement does not diminish the individualized and personalized nature of the informational injury, any more than a jointly signed FOIA request would. The impetus for such requests comes from individual members' judgment that they need particular information. These individual Committee members do not require the support or permission of the full Committee to make the request.

Those injuries, though, were not personal and particularized to the six legislators, but instead trod on powers vested in the House and Senate and their members as a whole. The six legislators sought to vindicate a diffuse "institutional injury"—"the diminution of legislative power"—that was suffered by Congress as an entity, and so "necessarily damage[d] all Members of Congress and both Houses of Congress *equally*." *Raines*, 521 U.S. at 821 (emphasis added). There was, after all, no claim that, under the Line Item Veto Act, the plaintiff legislators were "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Id.*; *see also Blumenthal*, 949 F.3d at 19 ("This case is really no different from *Raines*. The [m]embers were not singled out—their alleged injury is shared by the 320 [M]embers of the Congress who did not join the lawsuit—and their claim is based entirely on the loss of political power."). So the injury on which the suing legislators in *Raines* tried to predicate standing was not personal and particularized to them. It was Congress's ox that was gored, not their own.

The same mismatch between the suing plaintiff and the injured party occurred in *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999). There, a group of legislators challenged the issuance of an executive order on the ground that its "issuance * * *, without statutory authority therefor, deprived the plaintiffs of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation involving interstate commerce, federal lands, the expenditure of federal monies, and implementation of the [National Environmental Policy Act]." *Id.* at 113 (formatting modified). As in *Raines*, any such harm befell the institution as a whole and all legislators collectively. No personal injury occurred that was individualized to the plaintiffs. *See also Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011) (When a legislative vote is cast, "[t]he legislative power thus committed

is not personal to the legislator but belongs to the people; the legislator has no personal right to it."); *Campbell v. Clinton*, 203 F.3d 19, 20, 22–23 (D.C. Cir. 2000) (legislators lacked standing to challenge the use of American forces against Yugoslavia on the grounds that the President violated the War Powers Clause of the Constitution and the War Powers Resolution because the claimed injuries were to the legislative power as a whole).[5]

The Requesters' injury is a horse of a different color. The Requesters do not assert an injury to institutional powers or functions that "damages all Members of Congress and both Houses of Congress equally." *Raines*, 521 U.S. at 821. The injury they claim—the denial of information to which they as individual legislators are statutorily entitled—befell them and only them. Section 2954 vested them specifically and particularly with the right to obtain information. The 34 other members of the Committee who never sought the information suffered no deprivation when it was withheld. Neither did the nearly 400 other Members of the House who were not on the Committee suffer any informational injury. Nor was the House (or Senate) itself harmed because the statutory right does not belong to those institutions. In other words, their request did not and could not, given their non-majority status, constitute the type of "legislative * * * act" that might warrant treating them differently from private plaintiffs for standing purposes. *Chenoweth*, 181 F.3d at 114; c*f*. Dissenting Op. 8 n.5. Instead, the Requesters sought the information covered by Section 2954 in this case to inform and equip them personally to fulfill their

---

[5] In *Campbell*, the legislators also advanced a vote nullification argument premised on the Supreme Court's holding in *Coleman*. *Campbell*, 203 F.3d at 22. This court rejected that claim, concluding that, because Congress had not voted to bar the use of force, the President had not nullified any vote. *Id.* at 23.

professional duties as Committee members.  They alone felt the informational loss caused by the agency's withholding.[6]  And they alone had an incentive to seek a remedy.

In that regard, the injury is the same as one suffered by a FOIA plaintiff.   All persons, including legislators, are statutorily permitted under FOIA to seek information from federal agencies to monitor and scrutinize the activities of federal agencies.   5 U.S.C. § 552(a)(3)(A).   But not all individuals have standing to sue following the denial of a FOIA request.   Instead, only the individual or entity who filed the request and was denied the information has suffered a cognizable informational injury that can be enforced in federal court.  "The filing of a request, and its denial, is the factor that distinguishes the harm suffered by the plaintiff in a FOIA case from the harm incurred by the general public arising from deprivation of the potential benefits accruing from the information sought." *McDonnell v. United States*, 4 F.3d 1227, 1236–1238 (3d Cir. 1993).

So too here.  Although all Committee members have the right to pursue a request under Section 2954, an Article III injury occurs only after a request that has been made is denied.

---

[6] The Dissenting Opinion asserts (at 9) that the Requesters' claim to standing is similar to the standing argument rejected by the Supreme Court in *Hollingsworth v. Perry*, 570 U.S. 693 (2013).  Not so.  The *Hollingsworth* petitioners lacked standing because they "had no 'direct stake' in the outcome of their appeal" beyond vindicating a "generally applicable" law.   570 U.S. at 705–706.   Here, the Requesters do not seek to vindicate the constitutionality of a law—a matter in which all legislators would have an equivalent interest.  They seek to obtain information that a statute authorizes them to obtain as individuals.  And their stake in the outcome of this litigation is specific and particularized:  If they prevail, they will obtain the information they have individually sought.

And that injury is inflicted only on those who asked for the information. Here, the Requesters are the only ones who sought the information from the GSA, and so were the only ones who suffered a concrete and particularized injury by the GSA's denial. "[T]he requestor has suffered a particularized injury because he has requested and been denied information Congress gave him a right to receive." *Prisology*, 852 F.3d at 1117. To be sure, Congress created the Requesters' underlying informational right. But that does not transform the particularized injury suffered by rebuffed requesters into one dispersed across all of Congress. Just as Congress's enactment of FOIA does not mean that the particularized injury suffered by a legislator's unsuccessful FOIA request is shared by Congress as the body that empowered such requests.

The Supreme Court's decision in *Powell* confirms the personal nature of the Requesters' informational injury. In *Powell*, the Court concluded that a congressman, Adam Clayton Powell, Jr., had standing to sue Members of Congress and the leadership of the United States House of Representatives after he was barred from taking his seat. 395 U.S. at 489. In addition to the denial of his seat, Powell's salary was withheld. *Id.* at 493. The Court concluded that the suit satisfied Article III's requirement that legislators sue based on a personal injury. *Id.* at 512–514; *see also Raines*, 521 U.S. at 821 (confirming that Powell suffered a personal injury by being deprived of something to which he "personally" was entitled as an elected legislator). While the harms pertained directly to his fulfillment of his role as a legislator, they were individualized and confined to him. No other Representative suffered the loss of Powell's seat or of Powell's salary.

The GSA asserts that the Requesters are different from Powell. It points to the Supreme Court's statement in *Raines* that, "[u]nlike the injury claimed by Congressman Adam

Clayton Powell, the injury claimed by the Members of Congress here is not claimed in *any* private capacity but *solely* because they are [M]embers of Congress." *Raines*, 521 U.S. at 821 (emphasis added).

But the GSA's argument misses the Supreme Court's point. After all, the right at issue in *Powell*—to receive a House of Representatives salary, to take a seat in Congress, and to exercise the powers of that office—followed from and was bound up with, not disconnected from, Powell's status as a legislator. *Cf. Nevada Comm'n on Ethics*, 564 U.S. at 126 ("[A] legislator casts his vote 'as trustee for his constituents, not as a prerogative of personal power.'") (quoting *Raines*, 521 U.S. at 821).

As the Supreme Court went on to explain, what made the claims in *Raines* institutional rather than personal was that the interest asserted there ran with the seat in that "the claim would be possessed by [the legislator's] successor," and so belonged to Congress, not the individual Member. *Raines*, 521 U.S. at 821. By contrast, even though Powell's claims were intrinsically intertwined with his position as a Member of Congress, Powell's successor could not claim the same injury or assert the same claims as Powell to the seat and salary for the congressional term to which he was elected. The injury was to Powell's own performance of his legislative job, and so ran to and with the person, not the institution. *See Alaska Legis. Council v. Babbitt*, 181 F.3d 1333, 1338 n.3 (D.C. Cir. 1999) ("[A]n elected representative excluded from the legislature and denied his salary alleges a personal injury because he has been 'singled out for specially unfavorable treatment as opposed to other [m]embers' of that body.") (quoting *Raines*, 521 U.S. at 821).

The same is true here. The GSA does not contend, nor could it, that the informational injury asserted here runs with the Committee seat such that any legislators replacing the Requesters would be successors to this claim. While the *legal right* to request information under Section 2954 runs with Committee membership, the injury arises from the asking and its rebuff, not from the seat itself. If one of the Requesters were to leave the Committee, the injury sued upon would end with her service. Just like *Powell*. Powell's successor would have had an undoubted right to draw a salary from the United States' Treasury and to take the legislative seat, but the denial of Powell's salary and denial of his seat did not work an injury to his successor. And Powell's right to that seat and salary similarly would have terminated when he left his legislative position. In that regard, we agree with the Dissenting Opinion: Powell "sought the position to which he had been elected and all its benefits." Dissenting Op. 7. These Requesters too seek a benefit that Section 2954 invests in them in their individual legislator capacities. And so they "assert a personal injury [because] they allege they were 'deprived of something to which they *personally* are entitled[.]'" *Id*. at 4 (quoting *Raines*, 521 U.S. at 821).

In other words, for Article III purposes, the requirement that a legislator suffer a "personal" injury does not mean that the injury must be *private*. Instead, the requirement of a personal injury is a means of rigorously ensuring that the injury asserted is particularized and individualized to that legislator's own interests. That is, the injury must be one that "zeroes in on the individual," *Kerr*, 824 F.3d at 1216, rather than an injury that "necessarily damages all Members of Congress and both Houses of Congress equally" or that runs with the institutional seat, *Raines*, 521 U.S. at 821.

That same understanding of "personal" injuries suffered by legislators was well articulated by the Tenth Circuit in *Kerr*:

> An individual legislator certainly retains the ability to bring a suit to redress a personal injury, as opposed to an institutional injury. For example, if a particular subset of legislators was barred from exercising their right to vote on bills, such an injury would likely be sufficient to establish a personal injury. Under those circumstances, the legislator could claim a personal injury that zeroes in on the individual and is thus concrete and particularized.

824 F.3d at 1216 (applying *Raines* to state legislators) (citations omitted); *see also Alaska Legis. Council*, 181 F.3d at 1338 n.3 ("[A] representative whose vote was denied 'its full validity in relation to the votes of [his] colleagues,' might also allege a personal injury sufficient to confer standing.") (quoting *Raines*, 521 U.S. at 824 n.7).

The Dissenting Opinion responds that "[n]othing in the statute [Section 2954] suggests this mechanism for requesting documents is a personal benefit for [m]embers of the Committee, rather than a practical tool" that members can use to "advanc[e] the work of the Committee." Dissenting Op. 8. That overlooks Section 2954's express conferral of its informational right on a *minority* of committee members. Committee tools like subpoenas, by contrast, require the majority's assent to be exercised. *See* House Rule XI, cl. 2(m)(3)(A)(i) (subpoena power may be exercised by the committee or may be delegated by the committee to its chair "under such rules and under such limitations as the committee may prescribe"); Rule 12(g), Rules of the Comm. on Oversight & Gov't Reform of the U.S. House of Representatives, 115th Cong. (2017) (delegating subpoena power to the committee

chair); *see also* House Rule X, cl. 5(c) (majority party selects committee chairs). So Section 2954's plain terms invest the informational right in legislators, not the legislature. Which makes the deprivation of requested information an injury personal to the requesting legislators.

**2**

The GSA also suggests that the asserted injury cannot be personal because members of the House Committee are chosen, in part, based on their party affiliation. *See* GSA Supp. Br. 4–5. Members of the Committee are nominated for membership by their "respective party caucus or conference." House Rule X, cl. 5(a)(1). Those nominations are then voted on by the full House. *Id.*[7]

But the GSA never finishes the thought. It is hard to see how the process for committee selection diminishes the informational injury suffered when an agency refuses to comply with a Section 2954 request. Nothing in Section 2954 turns on the political affiliation of the requesters, nor does it require that the requesters be of a single party. In any event, members of a political party also nominated Powell as their candidate for legislative office. *See* Clayton Knowles, *Edge Is 61 Votes*, N.Y. TIMES, June 29, 1966, at 1, 34. And it seems quite likely that he was elected to that legislative seat based in some part on his political affiliation, positions, and persuasion.

---

[7] Members of Congress not affiliated with either major political party are also able to serve. Typically, such Members "associate with one [party] for purposes of being assigned to standing committees." *Precedents of the United States House of Representatives*, vol. 1, ch. 3, § 8 (2017) ("2017 House Precedents"), https://go.usa.gov/xd8q9 (last accessed Dec. 21, 2020).

Yet that party connection had no bearing on the personal nature of the harms he suffered by virtue of his legislative status.

Nor do rules regarding the removal of Committee members bear on the injury analysis. Under House Rule X, Clause 5(b), if a legislator ceases to be a member of the party that nominated him or her to the Committee, the member's committee membership is vacated. Of course, any informational injury incurred by that member would also end with the loss of the seat. Which makes sense because the informational right is meant to equip individual Committee members with the information needed to discharge their duties on the oversight committees. That same feature also underscores the personal and individuated, rather than institutional, character of the legal right and the injury suffered.

**3**

In its supplemental brief to this court, the GSA also hints at a constitutional avoidance argument:

> Indeed, if the ability to request information under section 2954 were truly a "personal" right enforceable under Article III, then House Rule X, Clause 5(b) would raise serious constitutional concerns. After all, a Member of Congress has the right under the First Amendment to switch political parties, yet House Rule X, Clause 5(b) penalizes that switch in parties (and the resulting resignation or expulsion from the original congressional party's caucus or conference), by *automatically* terminating the Member's seat on the Committee, and hence his or her putative "right" to request information under section 2954.

GSA Supp. Br. 7–8.

The GSA's reasoning on this point is hard to follow. It seems as though the GSA continues to equate a personal injury with a purely private injury. What is more, if terminating a member's Committee seat does not run afoul of the First Amendment, it is hard to see how the attendant loss of an informational right under Section 2954 would change the constitutional calculus.

In any event, we need not probe this undeveloped argument further, as "[m]entioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

**D**

When called upon to adjudicate disputes between the Political Branches and their members, we apply the standing inquiry with special rigor. *Arizona State Legislature*, 135 S. Ct. at 2665 n.12 (noting that the inquiry is "especially rigorous") (quoting *Raines*, 521 U.S. at 819); *McGahn*, 968 F.3d at 763. We have done so here, and we find that Article III's standing requirements are fully met. The informational injury asserted is a traditional and long-recognized form of Article III injury. It is concrete—the request was made and straightforwardly denied; the Requesters have been and remain empty-handed. The injury is personal and particularized to the Requesters themselves, not to any other legislators, to a legislative body, or even to their Committee seats.

Article III's causation and redressability prongs are also straightforwardly met. *See Lujan*, 504 U.S. at 560 (stating an injury must be "fairly traceable to the challenged conduct of

the defendant" and "likely to be redressed by a favorable judicial decision"). The GSA's categorical refusal to provide the requested documents has caused the Requesters an informational injury. And a judicial order requiring compliance with Section 2954 would redress that injury, just as it routinely does in a FOIA suit.

Also, while the plaintiffs in *Raines* filed suit in defiance of the institution's views, 521 U.S. at 829 ("both Houses actively oppose the[] suit"), the Requesters' information inquiry comes with the strongest dispensation: The statutory authorization of both Houses of Congress and the President who signed Section 2954 into law, 5 U.S.C. § 2954. And for what it is worth, the House of Representatives has never opposed the Requesters' suit, nor has the Senate.

Also, unlike in *Raines*, relief cannot be obtained through the legislative process itself. *See* 521 U.S. at 829 (noting that Congress could repeal the offending Act or "exempt appropriations bills from its reach"). The statutory right, by its plain terms, applies to individual Committee members, as long as at least six others support the request, so that they can exercise their legislative role with informed vigor. To require the requesting members to obtain enforcement by a majority of the Committee or Chamber, as the Dissenting Opinion proposes (at 10), would be to empty the statute of all meaning, since a Committee or the Chamber can already subpoena desired information. *McGahn*, 968 F.3d at 764.

It also seems quite dubious that the 70th Congress that enacted Section 2954 would have thought that legislators in the minority should simply wait until they assumed majority status to seek judicial enforcement through the subpoena power instead. At the time Congress enacted Section 2954, changes in control of the House were rare. *See* Office of the Historian,

U.S. House of Representatives, *Party Divisions of the House of Representatives (1789 to Present)* (one party controlled the House for 32 of the 38 years between 1895 and 1933), https://history.house.gov/Institution/Party-Divisions/Party-Divisions/ (last accessed Dec. 21, 2020). This trend continued for the better part of the century after Section 2954's enactment. *See id.* (one party controlled the House for 60 of the 62 years between 1933 and 1995). Given that history, Congress plainly meant exactly what Section 2954 says: Non-majority legislators too are empowered to seek the information needed to do their jobs. In that way, the statutory right is distinctly non-institutional.

Nor does this case implicate any potentially special circumstances. It is not a suit against the President or a claim for information from him. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) (stating that the President is not an agency under the Administrative Procedure Act); *see also* 5 U.S.C. § 105 ("For purpose of this title, 'Executive agency' means an Executive department, a Government corporation, and an independent establishment."). Section 2954, like FOIA, only allows requests for information from an "Executive agency[.]" 5 U.S.C. § 2954; *see id.* §§ 551(1), 552(a).

Information requests against agencies like this are commonplace, and the informational deficit suffered is not lessened just because the Requesters are legislators. "[T]he requester's circumstances * * * are irrelevant to his standing." *Zivotofsky*, 444 F.3d at 617. The GSA admits as much when it concedes that these same Requesters would suffer an Article III-cognizable informational injury if they sought the same information under FOIA. *See* Oral Arg. Tr. 26 ("[W]e're not disputing that the Plaintiffs can invoke FOIA."). Yet the GSA offers no sound reason, grounded in Article III principles, as to why the informational injury becomes more or less

sufficient under Article III based on whether non-legislative people could, if they wanted, also ask for information under the same statute. Indeed, the fact that information requests under Section 2954 are less widely available than record requests under FOIA would seem to make the injury more personal and particularized, not less.

Notably, the GSA's opposition to legislator standing is categorical; it does not argue that any difference between the scope of Section 2954 and FOIA is itself of separation-of-powers moment.

For similar reasons, the Dissenting Opinion's worry that recognizing standing "ruinous[ly]" opens the judicial floodgates to suits by "errant" Members of Congress "acting contrary to the will of their committee, the will of their party, and the will of the House" falls flat. Dissenting Op. 11. That is because every Member of Congress, errant or otherwise, has been able under FOIA since 1966 to seek similar information from Executive Branch agencies as was requested here, with no hint of such untoward results.

The separation of powers, it must be remembered, is not a one-way street that runs to the aggrandizement of the Executive Branch. When the Political Branches duly enact a statute that confers a right, the impairment of which courts have long recognized to be an Article III injury, proper adherence to the limited constitutional role of the federal courts favors judicial respect for and recognition of that injury.

## IV

For those reasons, we hold that the Requesters have asserted an informational injury that is sufficient for Article III standing. This decision resolves only the standing question decided by the district court. To the extent the GSA's argument

or the district court's reasoning implicate the existence of a cause of action, the appropriate exercise of equitable discretion, or the merits of the Requesters' claims, those issues remain to be resolved by the district court in the first instance.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

GINSBURG, *Senior Circuit Judge*, dissenting:  When this court recently considered the standing of a committee of the House of Representatives to enforce a subpoena, we asked ourselves the same question we must answer today: "whether the claimed injury is personal to the plaintiff or else shared by a larger group of which the plaintiff is only a component – in other words, whether the injury is particularized." *Committee on the Judiciary, U.S. House of Representatives v. McGahn,* 968 F.3d 755, 767 (2020).  We held a House committee had standing to seek judicial enforcement of a subpoena that it had issued to a former Executive Branch official and that it had been authorized by a vote of the full House to pursue in court. *Id.*  Because the committee was acting on behalf of the full House, the committee was "an institutional plaintiff asserting an institutional injury," so there was no "mismatch" between the plaintiff and the injured party. *Id.*

This case is fundamentally different.  Here, 15 individual Members of the House claim a statute enacted in 1928 and never successfully invoked in litigation gives each of them a personal right to exercise the investigative powers of the House of Representatives.  *See* 5 U.S.C. § 2954.[1]  Although, as my colleagues remind us more than once, "'our standing inquiry has been especially rigorous' when the suit pits members of the two Political Branches against each other," Ct. Op. 12, 30 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)), the Court today strains Supreme Court precedent to uphold the standing of Plaintiff-Members to assert the interests of the whole House.

*     *     *

---

[1] The statute, entitled "Information to committees of Congress on request," reads in relevant part: "An Executive agency, on request of the Committee on [Oversight and Reform] of the House of Representatives, or any seven members thereof ... shall submit any information requested of it relating to any matter in the jurisdiction of the committee."

Again, the key question in this case is this: Whether the harm the Plaintiff-Members allege is personal to each of them or is a harm to the House as an institution. The Supreme Court has clearly stated that "individual members lack standing to assert the institutional interests of a legislature." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950, 1953-54 (2019) (citing *Raines*, 521 U.S. at 829, and holding "a single chamber of a bicameral [state] legislature" lacks standing to appeal the invalidation of a redistricting plan because redistricting authority is vested in the legislature as a whole); *accord McGahn,* 968 F.3d at 767. In other words, there can be no "mismatch between the [party] seeking to litigate and the body" that suffered the alleged harm. *McGahn*, 968 F.3d at 767. Here, the mismatch is plain. The harm the Plaintiff-Members allege – *viz*., the "impedance of [their] legislative and oversight responsibilities" – is a harm to the House of Representatives, of which each plaintiff is only one among 435 Members.[2] Accordingly, the Plaintiff-Members lack standing to bring this case.

Article III of the Constitution of the United States permits the federal courts to hear "cases" and "controversies" and nothing more. *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969). To stay within our "proper constitutional sphere," the court must ensure in each case that the party invoking its power has standing to do so. *Raines*, 521 U.S. at 819-20; *Va. House of Delegates*, 139 S. Ct. at 1950. This requirement is rooted in the separation of powers. *See* Ct. Op. 11-12. The standing

---

[2] *See Raines*, 521 U.S. at 829 n.10 ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as whole." (quoting *United States v. Ballin*, 144 U.S. 1, 7 (1892))).

doctrine buttresses that separation by limiting the judicial power "only to redress or otherwise protect against injury to the complaining party," and not to "general supervision of the operations of government." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975); *Raines*, 521 U.S. at 829 (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974)). Separation of powers concerns are "particularly acute ... when a legislator attempts to bring an essentially political dispute into a judicial forum." *Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999).

To establish their standing, the plaintiffs must allege they suffered an injury-in-fact that is both concrete and particularized. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). A court must consider each of these requirements independently. *See id.* at 1545. The Plaintiff-Members here do allege a concrete harm, *see id.* at 1549 (holding the denial of a statutory right to information is a concrete injury), but they do not allege a harm particularized – that is, personal – to themselves. *See McGahn*, 968 F.3d. at 766 ("For an injury to be particularized, it must affect the plaintiff in a personal and individual way." (quoting *Spokeo*, 136 S.Ct. at 1548) (internal quotation marks omitted)). The particularization requirement helps to ensure the plaintiff is the appropriate party to vindicate the claim. *See Warth*, 422 U.S. at 499 ("A federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered"); *Blumenthal v. Trump*, 949 F.3d 14, 18 (D.C. Cir. 2020) (holding 215 Members of the Congress lacked standing to seek a declaration that the president was violating the Foreign Emoluments Clause of the Constitution, and explaining that "our standing inquiry ... focuses on whether the plaintiff is the proper party to bring the suit" (cleaned up)).

The particularization inquiry is of special importance when the plaintiffs are legislators. Thus did *Raines,* "our

starting point when individual members of the Congress seek judicial remedies," *Blumenthal*, 949 F.3d at 19, distinguish between "personal" injuries, which are particular to the plaintiff, and "institutional" injuries, which are not.[3] *Raines*, 521 U.S. at 818-19, 821. Legislators assert a personal injury when they allege they were "deprived of something to which they *personally* are entitled — such as their seats as Members of Congress after their constituents had elected *them*." *Raines*, 521 U.S. at 821. In contrast, legislators assert an institutional injury when they allege "a loss of political power," *id.*, and an institutional injury requires an "institutional plaintiff." *AIRC*, 135 S. Ct. at 2664. Maintaining this distinction helps avoid a mismatch between the party suing and the party harmed. *See McGahn,* 968 F.3d at 767 (explaining legislator-standing cases require "an inquiry into whether the claimed injury is personal to the plaintiff or else shared by a larger group ... in other words, whether the injury is particularized").

The Plaintiff-Members here allege harm to the House rather than to themselves personally. Their theory of injury is that the General Services Administration (GSA), by refusing their request for certain documents, hindered their efforts to oversee the Executive and potentially to pass remedial

---

[3] The Supreme Court has allowed individual legislators to sue over an institutional injury in one and only one situation: "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (explaining *Coleman v. Miller*, 307 U.S. 433 (1939)); *see also Ariz. State Legis. v. AIRC*, 135 S. Ct. 2652, 2665 (2015) (confirming this understanding of *Coleman*). The "*Coleman* exception to the *Raines* rule," as this court has called it, *Campbell v. Clinton*, 203 F.3d 19, 22 (2000), clearly does not apply here because this is not a case about a disputed vote.

legislation. The Complaint is clear and consistent on this point: The Plaintiff-Members were harmed through the "impedance of the oversight and legislative responsibilities that have been delegated to them by Congress involving government management and accounting measures and the economy, efficiency, and management of government operations and activities." Compl. ¶ 36. More specifically, the Plaintiffs-Members, who sit on the Committee on Oversight and Reform, allege the denial of their requests under 5 U.S.C. § 2954 thwarted their efforts to evaluate several aspects of the GSA's management of the Trump Old Post Office lease, and hence their ability to "recommend to the Committee, and to the House of Representatives, legislative and other actions that should be taken to cure any existing conflict of interest, mismanagement, or irregularity in federal contracting." *Id.* That the allegations of harm go to the Plaintiff-Members' responsibilities for oversight and legislation makes manifest the institutional nature of the harm in this case.

When a defendant impedes legislators in the fulfillment of their legislative duties, the defendant harms the legislature, not the legislators. After all, a legislator legislates "as trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S. at 821. Any legislative power delegated to a legislator "is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011).

The power to oversee the workings of the Executive Branch likewise belongs to the House (and the Senate) as an institution. Each House of the Congress has an inherent power to conduct investigations, including "probes into departments of the Federal Government to expose corruption, inefficiency or waste." *Watkins v. United States*, 354 U.S. 178, 187 (1957). This power has long been recognized as an "auxiliary to the

legislative function," *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927), as was reconfirmed earlier this very year in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020): "[E]ach House has power to secure needed information in order to legislate," which power is "justified solely as an adjunct to the legislative process." (quotations omitted). *Accord McGahn*, 968 F.3d at 764 ("Each House of Congress is specifically empowered to compel ... the production of evidence in service of its constitutional functions"). Just as the legislative power is not vested personally in individual legislators, neither is the auxiliary power of oversight. Indeed, the power of oversight is so squarely committed to the institution that an investigation is illegitimate if it is conducted to further the personal interests of legislators rather than to aid the House in legislating. *Mazars*, 140 S. Ct. at 2032 ("Investigations conducted solely for the personal aggrandizement of the investigators ... are indefensible" (quoting *Watkins*, 354 U.S. at 200)).

The Plaintiff-Members sought information from the GSA in order to search for a "conflict of interest, mismanagement, or irregularity" and to recommend remedial legislation – a clear exercise of the oversight power of the House. Compl. ¶ 36; *compare Watkins*, 354 U.S. at 187 (reaffirming the House's power to probe for "corruption, inefficiency or waste" in furtherance of "intelligent legislative action"). When their request was refused, it was the House that suffered a legally cognizable injury-in-fact, not the Members who bring this suit.

My colleagues rely upon *Powell v. McCormack*, 395 U.S. 486 (1969), to reach the opposite conclusion, but that case is in complete harmony with the principles just discussed. During the 89th Congress, a House investigation found evidence that longtime congressman Adam Clayton Powell, Jr. had overstated his travel expenses. *Id.* at 489-90. At the start of the 90th Congress, the House barred Powell from taking his

seat. *Id.* at 493. Powell sued for his seat and his salary, and a declaration that his exclusion violated the Constitution. *Id.* While the case was being litigated, Powell was reelected; the 91st Congress allowed him to take his seat but stripped him of his seniority and fined him $25,000. *Id.* at 494-95. The House defendants argued Powell's case was moot. *Id.* at 496. The Supreme Court disagreed: Powell had an "obvious and continuing interest in his withheld salary," so there remained a live case or controversy. *Id.* at 496-99.

The Supreme Court, in denying standing to the legislator plaintiffs in *Raines,* distinguished *Powell* in terms that apply equally to this case: "Unlike the injury claimed by Congressman Adam Clayton Powell, the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress." 521 U.S. at 821. Powell's claim was justiciable not because he had been deprived of his ability to legislate or investigate; it was justiciable because Powell claimed he was owed money, to which he was "*personally* ... entitled." *Id.*

The Members' injury here is also quite different from the denial of Powell's seat.[4] Powell sought the position to which he had been elected and all its benefits. The political power of the House was not diminished by his absence – the harm fell upon Powell alone. Claiming a seat in the House of

---

[4] The Supreme Court held Powell's case presented a case-or-controversy based solely upon his request for back pay, as Powell had been seated by the time the Supreme Court issued its decision. *See Powell*, 395 U.S. at 495-96. Nevertheless, the Supreme Court's discussion in *Raines* suggested the denial of Powell's seat was also a personal injury. 521 U.S. at 821; *see also Campbell*, 203 F.3d at 21 n.2 (noting the deprivation of Powell's salary and seat were "both personal injuries").

Representatives is personal; wielding the investigative power of the House is not.

That § 2954 delegates authority to certain Members to request information from an Executive agency does not mean it confers a right personal to each of them. The Congress enacted § 2954 in an apparent attempt to "reform Congress's oversight of public expenditures." Appellant's Br. at 13-14. The Member-Plaintiffs inform us that prior to the passage of § 2954 various statutes required federal agencies to send hundreds of periodic reports to the House for review. *Id.* at 16 (citing H.R. Rep. No. 70-1757, at 6). By 1928, many of these reports had become outdated and irrelevant. *Id.* The statute discontinued these reports, while providing a mechanism for the Committee on Oversight, "or any seven members thereof," to make more targeted and useful requests of the Executive. *See* An Act to Discontinue Certain Reports Now Required by Law to Be Made to Congress, Pub. L. No 70-611, 45 Stat. 986 (1928). Nothing in the statute suggests this mechanism for requesting documents is a personal benefit for Members of the Committee, rather than a practical tool made available to Members for the purpose of advancing the work of the Committee.[5] *See id.*

---

[5] The Court gets off track when it analogizes a request made by Members under § 2954 to a request made under the Freedom of Information Act. The GSA has already given the Plaintiff-Members all the information to which they were entitled under the FOIA. In its cases on legislator standing, the Supreme Court has not looked for analogies to statutes like the FOIA that make no distinction between legislators and other members of the public. To the contrary, the Court long ago forced us to rethink our view "that congressional and private plaintiffs should be treated alike for the purpose of determining their standing." *Chenoweth*, 181 F.3d at 114-15 (holding this principle was "untenable in the light of *Raines*").

The Court makes much of the fact the statute gives the ability to make requests "specifically and particularly" to a group of Committee Members, rather than to any group of Members of the House. Ct. Op. 22. The Supreme Court considered a similar argument in *Hollingsworth v. Perry*, 570 U.S. 693 (2013), where the official proponents of a successful ballot initiative asserted they had standing to defend the constitutionality of the law resulting from their initiative. The proponents stressed their "'unique,' 'special,' and 'distinct' role in the initiative process" under state law, but the Supreme Court was not persuaded. *Id.* at 706. Notwithstanding the proponents' particular role, their interest was shared with every citizen of their state. *Id.* at 706-07. Just so here. Requests must come from Members of the Committee, but it does not follow that Committee Members suffer a *personal* harm when a request is denied.

From the foregoing discussion, it is clear the Plaintiff-Members have not alleged the impedance of their legislative duties harmed them in any private or personal capacity. Rather, they allege and seek to redress an institutional injury that befell the House of Representatives. This is fatal to their case: "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates*, 139 S. Ct. at 1953.

\* \* \*

Making a request for information is just the first step in the process of congressional oversight of an Executive agency. An Executive agency is likely to grant routine requests. *See* Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 107-08 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel) (stating

§ 2954 may be used to obtain "routine information"); *Id.* at 71 (informal requests from a single legislator are "usually accommodated"). If a request is refused, the Committee on Oversight and Reform can issue a subpoena. If the subpoena is ignored, the House can, by majority vote, authorize the Committee to seek judicial enforcement or to hold the respondent in contempt. This process is more cumbersome than allowing seven individual Members to sue without persuading a majority of their colleagues,[6] but it is necessary to safeguard against investigative demands made for "personal aggrandizement of the investigators" or for other idiosyncratic reasons. *See Mazars*, 140 S. Ct. at 2032. Once their party became the majority in the House, if not earlier, the Plaintiff-Members in this case might well have obtained a subpoena from the Committee and, if necessary, a House Resolution authorizing suit. *See McGahn*, 968 F.3d at 764 ("The Supreme Court has ... long held that each House has power to secure needed information through the subpoena power" (cleaned up) (quoting *Mazars*, 140 S. Ct. at 2031)); *United States v. AT&T*,

---

[6] My colleagues insist that "[t]o require the requesting members to obtain enforcement by a majority of the Committee or Chamber ... would be to empty the statute of all meaning." Ct. Op. 31. That seems to assume without reason that the Executive habitually ignores requests made pursuant to the statute. In any event, it is a fundamental precept that the "Congress cannot erase Article III's standing requirements" by statute. *Spokeo*, 136 S. Ct. at 1547-48 (quoting *Raines*, 521 U.S. at 820 n.3). The Congress attempted to do so in *Raines* itself. There, as we recently summarized, although the statute the legislators challenged "provided that '[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action, [in our District Court] for declaratory and injunctive relief on the ground that ... [it] violates the Constitution,' the Members of Congress were still required to show an injury in fact to establish constitutional injury." *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 10 (D.C. Cir. 2020) (quoting *Raines*, 521 U.S. at 815-16) (first two alterations in original).

551 F.2d 384, 391 (D.C. Cir. 1976) (holding the House of Representatives has standing to enforce a subpoena in court); House Rule XI, cl. 2(m) (governing the House's subpoena power). Perhaps they preferred to take their chance on establishing a more powerful precedent.

The consequences of allowing a handful of members to enforce in court demands for Executive Branch documents without regard to the wishes of the House majority are sure to be ruinous. Judicial enforcement of requests under § 2954 will allow the minority party (or even an ideological fringe of the minority party) to distract and harass Executive agencies and their most senior officials; as the district court said, it would subject the Executive to "the caprice of a restless minority of Members." *Cummings v. Murphy*, 321 F. Supp. 3d 92, 115 (2018). In the past this court has warned it would be hesitant to enforce a document demand made by "a wayward committee acting contrary to the will of the House." *AT&T*, 551 F.2d at 393; *see also id*. at n.16 (explaining the requirement of a resolution of the full House to cite a witness for contempt "assures the witness some safeguard against aberrant subcommittee or committee demands"). Today's ruling does more than that; it blazes a trail for judicial enforcement of requests made by an errant group of Members acting contrary to the will of their committee, the will of their party, and the will of the House.

## Conclusion

Because the legislative power and the attendant power of investigation are committed to the House and not to its Members, a legislator does not suffer a personal injury when the denial of information he or she requested impedes the oversight and legislative responsibilities of the House. Accordingly,

*I respectfully dissent.*