# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed On: August 8, 2022

No. 18-5305

CAROLYN MALONEY, ET AL.,
APPELLANTS

VAL DEMINGS,
APPELLEE

v.

ROBIN CARNAHAN, ADMINISTRATOR, GENERAL SERVICES
ADMINISTRATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02308)

———

On Petition for Rehearing En Banc

———

**BEFORE:**   Srinivasan, Chief Judge; Henderson***, Rogers,
Millett**, Pillard, Wilkins, Katsas*, Rao***,
Walker***, and Childs*, Circuit Judges****

## **O R D E R**

Appellee Kale's petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

### **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:      /s/
Daniel J. Reidy
Deputy Clerk

\* Circuit Judges Katsas and Childs did not participate in this matter.

\*\* A statement by Circuit Judge Millett, joined by Senior Circuit Judge Tatel, concurring in the denial of rehearing en banc, is attached.

\*\*\* Circuit Judge Rao would grant the petition for rehearing en banc. A statement by Circuit Judge Rao, joined by Circuit Judges Henderson and Walker, and Senior Circuit Judge Ginsburg, dissenting from the denial of rehearing en banc, is attached.

\*\*\*\* A statement by Senior Circuit Judge Ginsburg is attached.

MILLETT, *Circuit Judge*, with whom Senior Circuit Judge TATEL joins, concurring in the denial of rehearing en banc: While much still remains to be litigated in district court, the court rightly denies rehearing en banc on the narrow issue before us. The only question in this case is whether Plaintiffs, who are individual Members of Congress, have standing to enforce an information request as authorized by a statute, 5 U.S.C. § 2954, that confers on certain legislators a right to obtain information from federal agencies. This court held that the Plaintiffs' injury—"[a] rebuffed request for information to which the requester is statutorily entitled"—has long been held to be "a concrete, particularized, and individualized personal injury, within the meaning of Article III." *Maloney v. Murphy*, 984 F.3d 50, 54 (D.C. Cir. 2020). Further, applying *Raines v. Byrd*, 521 U.S. 811 (1997), the court rejected the General Services Administration's ("GSA") contention that the injury of which the Plaintiffs complain was to Congress rather than to themselves as individual lawmakers. *See Maloney*, 984 F.3d at 62–70. I write to respond briefly to the views of my colleagues who thoughtfully dissent from the denial of rehearing en banc.

**I**

As Judge Ginsburg did in his opinion dissenting from the court's decision, Judge Rao characterizes the Plaintiffs' injury as institutional, not personal. She reasons that their power to request documents from GSA is a delegation of Congress's power of inquiry, which is "an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957); *see* Rao Dissent 10. Viewing the Plaintiffs' statutory right as one that really belongs to Congress, she argues that the injury that resulted from GSA's noncompliance is also institutional.

Not at all. The source of the Plaintiffs' informational right is not Congress's inherent power to obtain information in aid of legislation—as, say, a committee subpoena authorized by House rules would be. Rather, it is the express provision of a

federal law—5 U.S.C. § 2954—duly enacted by both Houses of Congress and signed into law by President Coolidge.  *See* Act of May 29, 1928, Pub. L. No. 70-611, 45 Stat. 986, 996. Their right to information, in other words, is the outcome of bicameralism and presentment, not an implicit constitutional power.

Beyond that, while the power of inquiry vests in "each House[,]" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020), and is exercised by "Congress, a Chamber of Congress, or a committee[,]" Section 2954 applies to members as individuals, *Maloney*, 984 F.3d at 55, 64.  Not only that, but Section 2954 extends an informational right to individuals in a committee minority, underscoring that, by its very design, the statute's right to information is entirely independent of any congressional or committee decision to investigate anything. So an individual's exercise of that specific statutory right to request information is neither derived from nor an exercise of the implicit investigative power.  *See id.* at 55–56.

Instead, the statutory right the Plaintiffs are enforcing is a product of Congress's Article I authority to ensure the proper functioning of government through accountability and transparency.  *See* U.S. CONST. Art. I, § 8, cl. 18.  That authority includes the power to create an individual right to obtain information, including from federal agencies.  The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Federal Advisory Committee Act, 5 U.S.C. app. 2 § 10(b), the Federal Election Campaign Act, 52 U.S.C. § 30104(b), the Endangered Species Act, 16 U.S.C. § 1539(c), the Government in the Sunshine Act, 5 U.S.C. § 552b, and the Privacy Act, 5 U.S.C. § 552a(d)(1), are all examples of statutes that create such a right.  And under these statutes, "[a]nyone whose request for specific information has been denied has standing to bring an action[.]"  *Zivotofsky ex rel. Ari Z. v. Secretary of*

*State*, 444 F.3d 614, 617–618 (D.C. Cir. 2006) (discussing FOIA, Government in the Sunshine Act, and Federal Advisory Committee Act); *see also, e.g.*, *Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989) (Federal Advisory Committee Act); *FEC v. Akins*, 524 U.S. 11, 21 (1998) (Federal Election Campaign Act); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040–1041 (D.C. Cir. 2016) (Endangered Species Act); *cf. Doe v. Chao*, 540 U.S. 614, 624–625 (2004) (observing that anyone who suffers an "adverse effect" from a violation of the Privacy Act "satisfies the injury-in-fact and causation requirements of Article III standing").

Section 2594 "is on all fours, for standing purposes, with the informational right conferred by those other statutes." *Maloney*, 984 F.3d at 61. And there is no dispute that Plaintiffs are among those in whom Section 2954 invests an informational right. So their Article III standing is no different from the standing of individuals to enforce other statutory rights to information in the federal government's possession. In other words, Section 2954 fits the tradition of numerous other information-disclosure statutes and, like many of them, is a product of Congress's Article I authority to enact statutes creating a right to obtain information from federal agencies about their taxpayer-funded activities, not some exercise of an implicit power to investigate.[1]

---

[1] Judge Rao contends that *Maloney* "assume[d] the most important question—whether a statute can constitutionally grant members of Congress a *personal* right, enforceable in federal court, to information from the Executive Branch." Rao Dissent 11. But Judge Rao does some assuming of her own in suggesting that Congress's power to command disclosure "stems exclusively from the legislative power[,]" Rao Dissent 2, despite the rich history of disclosure statutes that do not arise from Congress's inherent power of inquiry.

Judge Rao suggests that this statutory injury is not "grounded in historical practice[.]" Rao Dissent 5 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). To be sure, that the informational right in this case arises from a statute is not alone enough to decide the standing question because "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines*, 521 U.S. at 820 n.3. But the precedential basis for Congress's creation of such informational injuries is longstanding. Binding precedent from the Supreme Court and this court has long held that informational injuries give rise to standing. *See Spokeo*, 578 U.S. at 342 (citing *Akins* and *Public Citizen* as cases in which, consonant with the "common law * * *, the violation of a procedural right granted by statute" was sufficient "to constitute injury in fact"); *see also, e.g.*, *Public Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 21; *Zivotofsky*, 444 F.3d at 617–618; *Friends of Animals*, 824 F.3d at 1040–1041.

To be sure, Section 2954's informational right vests in individuals who are members of Congress, rather than in the general public. *See* Rao Dissent 17. But for standing purposes, that is beside the point. Article III standing depends on a plaintiff demonstrating an injury in fact, causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). The only prong at issue here is the injury-in-fact requirement, and reams of precedent has recognized that an informational injury is a "quintessential" injury in fact. *Maloney*, 984 F.3d at 59; *see also, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) (reiterating that plaintiffs who "allege that they failed to receive * * * required information" under a disclosure statute have standing). And Article III has never required that an otherwise qualifying injury in fact be shared with others—let alone the general public—before it counts. There is no *noscitur a sociis*

canon for Article III injuries; their existence does not depend on the company they keep.

What is more, Plaintiffs' injury is materially identical to an injury any member of the public *could* suffer: the denial of a FOIA request. Indeed, if these Plaintiffs had requested the same information under both FOIA and Section 2954, they would have standing to vindicate that informational injury. *Spokeo*, 578 U.S. at 342; *Zivotofsky*, 444 F.3d at 617–618. And their status as members of Congress would not change things: Under FOIA, "the requester's circumstances—why he wants the information, what he plans to do with it, what harms he suffered from the failure to disclose—are irrelevant to his standing." *Zivotofsky*, 444 F.3d at 617. The government agrees. Oral Arg. Tr. 26 (GSA Counsel: "[W]e're not disputing that the Plaintiffs can invoke FOIA."). And courts have long entertained FOIA actions brought by members of Congress even though, as Judge Rao observes, FOIA can "be used for any purpose[,]" legislative or otherwise. Rao Dissent 17; *see id.* 18–19 n.6; *EPA v. Mink*, 410 U.S. 73, 75 (1973) (adjudicating FOIA action brought by 33 members of Congress).

If Congress may, under 5 U.S.C. § 552, confer on Plaintiffs a right to this very same information, the denial of which gives rise to standing, it may do the same under 5 U.S.C. § 2954. Article III's standing inquiry does not change based on the section of Title 5 in which Congress houses the informational right.

Of course, Section 2954's scope is narrower than FOIA in that the informational right vests only in members of two congressional committees, and extends only to "information * * * relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954. But even if a Section 2954

request has a relationship to "official congressional responsibilities," Rao Dissent 19, that does not change the standing analysis.

After all, "personal, particularized" injuries suffered by legislators, and legislators alone, can affect prerogatives essential to the legislative role and yet still confer standing. *Maloney*, 984 F.3d at 62. For instance, Congressman Adam Clayton Powell had standing when he complained of the loss of his seat and his salary—both of which were entitlements meant *solely* to enable him to participate in legislating. *See Raines*, 521 U.S. at 821 (explaining that although members hold their seats "as trustee[s] for [their] constituents," "they *personally* are entitled" to them for standing purposes) (emphasis in original). The congressional seat for which he sued "pertained directly to his fulfillment of his role as a legislator," and yet its loss was still a concrete, individual harm that gave him Article III standing. *See Maloney*, 984 F.3d at 66.

Likewise, even if legislators are denied the right to engage in core legislative *acts*—like voting—on a particularized basis, they would have standing to remedy that denial. *See Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016); *Alaska Legis. Council v. Babbitt*, 181 F.3d 1333, 1338 n.3 (D.C. Cir. 1999); *cf. Raines*, 521 U.S. at 824 n.7.

This is all to say that an injury is not institutional simply because it trenches on a right that exists to enable legislators to perform their individual jobs. Even injuries that "pertain[] to the official, legislative powers of members" may be personal for standing purposes. Rao Dissent 16; *see id.* 9 n.3 ("[I]n narrow circumstances a private harm, like the denial of a salary, may result from an official position."). What matters is that the Plaintiffs complain of an injury that "befell them and only

them[,]" rather than "all Members of Congress[,]" "both Houses of Congress equally[,]" or the successor to the requester's committee seat. *Maloney*, 984 F.3d at 64 (internal quotation marks omitted) (quoting *Raines*, 521 U.S. at 821). Because Plaintiffs' informational injury "zeroes in on the individual[,]" it confers standing. *Kerr*, 824 F.3d at 1216.

Judge Rao is correct that Congress enacted Section 2954 to aid committee members' work and the legislative process as a whole. *See* Rao Dissent 17–19. The statute's text and legislative history confirm as much. *See* 5 U.S.C. § 2954; H.R. REP. NO. 1757, 70th Cong., 1st Sess. 3, 6 (1928); *Maloney*, 984 F.3d at 55–56. But Congress's subjective policy goals in passing a law have no role in the standing analysis. With FOIA, Congress likewise sought to make oversight of the executive branch work better by "pierc[ing] the veil of administrative secrecy and * * * open[ing] agency action to the light of public scrutiny[.]" *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). That underlying purpose, however, does not mean that FOIA requests are somehow a delegation of Congress's oversight powers. And (it bears repeating) that remains true even when members of Congress seek information germane to their legislative work under FOIA. *Maloney*, 984 F.3d at 69. Indeed, if Congress had simply amended FOIA to expressly include members of the two legislative committees listed in Section 2954 seeking information relevant to their job as "person[s]" who may obtain information, 5 U.S.C. § 552(a)(3)(A), the informational right and injury would be identical to that of any other FOIA claimant for standing purposes. That Congress accomplished that same end through two statutes rather than one has no bearing on Article III's injury-in-fact analysis.

**II**

Judges Rao and Ginsburg anticipate that the court's decision will have "ruinous" consequences. Ginsburg Dissent 2; *see* Rao Dissent 21–26. That concern does not stand up either practically or legally.

Their practical concern that the Executive Branch will be overwhelmed by Section 2954 lawsuits is misplaced. For one thing, Section 2954 has been on the books since 1928 without causing any such flood of litigation. Or even a puddle. *Compare* Pls.' Opening Br. at 19–20 (documenting a handful of occasions dating back three decades on which members have requested information under Section 2954), *with* Rao Dissent 23 n.8. For another thing, FOIA and a host of other federal laws already subject federal agencies to informational demands from the public—legislators included—and lawsuits if the agencies fail to comply. And remember, *more* Members of Congress can obtain *more* information of interest to them as legislators under FOIA than under Section 2954 because FOIA's right lacks Section 2954's limitations. That has been true since 1966, "with no hint of such untoward results." *Maloney*, 984 F.3d at 69. In any event, Article III is not a roadblock to suits judges happen to find uncongenial as a policy matter.

To the extent the dissenters are concerned about "whether a statute can constitutionally grant members of Congress a personal right, enforceable in federal court, to information from the Executive Branch[,]" Rao Dissent 11 (emphasis omitted), they are getting ahead of this case. This court has not yet even decided if Section 2954 creates a cause of action. More generally, questions about Section 2954's scope and constitutionality are for another day. *See Maloney*, 984 F.3d at 70 ("[T]he existence of a cause of action, the appropriate

exercise of equitable discretion, [and] the merits of the [Plaintiffs'] claims * * * remain to be resolved by the district court in the first instance."); Defs.' Mot. to Dismiss at 36, *Cummings v. Murphy*, 321 F. Supp. 3d 92 (D.D.C. 2018) (No. 17-2308), ECF No. 8 (asserting that Plaintiffs' use of the statute could "raise serious constitutional concerns."). The *only* question before the court in this case was whether the Plaintiffs have suffered an informational injury in fact for Article III standing purposes. In answering that question, we assume that the Plaintiffs are correct on all merits questions in the case, including the existence of a cause of action and the constitutionality of the statute that provides the source of their asserted legal claim. *See NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012); *Maloney*, 984 F.3d at 58.

The central mistake that the dissenting opinions make is trying to force the injury-in-fact prong of the Article III standing analysis to take on the substantive merits work of resolving their constitutional qualms about this statutory scheme, facially or as applied. The en banc court rightly recognizes today that there is no need for Article III to get out over its skis. Those constitutional questions and more await resolution on remand. All we have held in this case is that the agency's denial of a statutorily conferred right to information inflicted an injury in fact on the requesting Plaintiffs.

* * *

For those reasons and with the greatest respect for my colleagues' dissenting views, I concur in the denial of rehearing en banc.

RAO, *Circuit Judge*, with whom Circuit Judges HENDERSON and WALKER and Senior Circuit Judge GINSBURG join, dissenting from the denial of rehearing en banc:

Disputes between Congress and the Executive over documents have occurred since the Founding but have seldom involved the Judiciary. In concluding that individual members of Congress have standing to sue when an executive agency rejects their requests for information, the panel majority clears the way for the federal courts to referee ordinary informational disputes between the political branches. The panel's rationale has no logical stopping point and would permit standing to even a single member of Congress suing the Executive. To reach this unprecedented holding, the panel relies on a nearly 100-year-old statute that allows members to request information from executive branch agencies and finds that 5 U.S.C. § 2954 creates a personal "informational right" for members exercising their "professional" legislative duties. *Maloney v. Murphy*, 984 F.3d 50, 64–65 (D.C. Cir. 2020). The Members' claim in this case, however, has no historical analogue. The panel's recognition of a personal injury to legislative power clashes with the fundamental constitutional principles that limit congressional standing, upends the balance of power between Congress and the Executive, and drags courts into disputes wholly foreign to the Article III "judicial Power."

Perhaps this is a logical culmination of this court's recent decisions on congressional standing, which continue to invoke the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811 (1997), while steadily moving away from its substantive foundation.[1] By recognizing standing for members of Congress

---

[1] *See Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 782 (D.C. Cir. 2020) (en banc) (Griffith, J., dissenting) (explaining that "[t]he majority returns this circuit to the prudential approach to standing that we experimented with

based on harms that are simultaneously personal and legislative, the panel decisively breaks with the structural constitutional limits articulated in *Raines*.

I would revisit the panel decision because, first, the text and structure of the Constitution, historical practice, and the Supreme Court's decisions all establish that individual members of Congress cannot bring suit to assert injuries to the legislative power. The federal courts do not superintend disputes between the political branches because such disputes are outside the traditional understanding of an Article III "Case" or "Controversy." Second, the power of members of Congress to investigate the Executive Branch stems exclusively from the legislative power. Section 2954 cannot convert that institutional legislative power into a personal "informational right" for members that is vindicable in federal court. Finally, allowing standing for members of Congress under Section 2954 not only expands the judicial power, but otherwise unbalances the Constitution's separation of powers.

The novel questions presented here are of exceptional importance, particularly because the D.C. Circuit has an effective monopoly over lawsuits between Congress and the Executive Branch. These questions should be resolved by the

decades ago and that the Supreme Court rejected in *Raines*"); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1 (D.C. Cir. 2020) (extending the *McGahn* majority's prudential approach to conflicts over appropriations), *vacated as moot*, 142 S. Ct. 332 (2021); *In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 617–18 (D.C. Cir. 2020) (Rao, J., dissenting) ("[A]llowing standing in this context would run against historical practice and the limited role of the federal judiciary in our system of separated powers.") (citing *Raines*, 521 U.S. at 819), *vacated as moot sub nom. Dep't of Justice v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021).

full court to realign our decisions with the Constitution and longstanding Supreme Court precedent.

## I.

Seventeen members of Congress brought this suit under an extraordinary statute, one that permits "any seven members" of the House Committee on Oversight and Reform or "any five members" of the Senate Committee on Homeland Security and Governmental Affairs—less than a majority of each committee—to compel executive agencies to disclose information. Act of May 29, 1928, Pub. L. No. 70-611 § 2, 45 Stat. 986, 996 (codified as amended at 5 U.S.C. § 2954). Upon such a request, "[a]n Executive agency … shall submit any information requested of it relating to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954.

This case concerns requests made under Section 2954 to the General Services Administration ("GSA") by members of the House Committee on Oversight and Reform (the "Committee"). The Members sought records relating to GSA's lease of the Old Post Office building to a company owned by President Donald Trump and members of his family. GSA did not provide the requested information, and members of the Committee who made the rebuffed requests brought this action seeking to compel disclosure. In particular, the Members pleaded that "numerous issues" concerning the lease "requir[ed] congressional oversight," including "potential conflicts of interest" and "GSA's ongoing management of the lease." The complaint repeatedly referenced the official oversight responsibilities of Congress and the Committee. The Members claimed the deprivation of information "thwart[ed]" their ability "to carry out their congressionally-delegated duty to perform oversight" and impeded the fulfillment of their "legislative responsibilities."

The district court dismissed the complaint on the jurisdictional ground that the Members lacked standing. *Cummings v. Murphy*, 321 F. Supp. 3d 92 (D.D.C. 2018). A divided panel of this court reversed, holding that Section 2954 confers an individual right to information on members of Congress, and that members have standing in federal court to assert those rights against an executive branch agency. *Maloney*, 984 F.3d at 54. Judge Ginsburg dissented, explaining that "[b]ecause the legislative power and the attendant power of investigation are committed to the House and not to its [m]embers, a legislator does not suffer a personal injury when the denial of information … impedes the oversight and legislative responsibilities of the House." *Id.* at 76.

## II.

The Members here allege they have standing to sue an executive branch agency for information because Section 2954 gives them a personal right to exercise the official legislative powers of investigation. Their claims are foreclosed by the Constitution, longstanding precedent, and historical practice, which dictate that harms to official legislative powers cannot be vindicated in the federal courts by individual legislators.

Article III of the Constitution extends the federal judicial power only to "Cases" or "Controversies." U.S. CONST. art. III, § 2. "No principle is more fundamental to the [J]udiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual [C]ases or [C]ontroversies." *Raines*, 521 U.S. at 818 (cleaned up). While the panel majority recites these constitutional limitations, it rests its standing analysis entirely on Section 2954, which purportedly "confers [an] informational right directly on … specific legislators so that they personally can properly

perform their roles on the oversight committees." *Maloney*, 984 F.3d at 61.

But "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines*, 521 U.S. at 820 n.3; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577–78 (1992). The standing inquiry, therefore, cannot simply begin and end with the so-called informational right created by Section 2954. To determine whether the Members' claim is judicially cognizable, we must consider whether the alleged harm is "grounded in historical practice" and "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (a concrete injury requires plaintiffs to "identif[y] a close historical or common-law analogue for their asserted injury"); *id.* at 2219 (Thomas, J., dissenting) (explaining that the requirement of concreteness developed with respect to public rights and interests).

Members of Congress seeking standing in the federal courts must satisfy particularly stringent requirements because of the serious separation of powers concerns raised by judicial resolution of disputes between the political branches. *See Raines*, 521 U.S. at 819–20; *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 803 n.12 (2015); *see also id.* at 854 (Scalia, J., dissenting); *Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999) (explaining that separation of powers concerns "are particularly acute [ ] when a legislator attempts to bring an essentially political dispute into a judicial forum"). As a result, the Supreme Court has established a narrow set of circumstances in which individual legislators can sue in federal court.

"*Raines* is our starting point when individual members of the Congress seek judicial remedies." *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) (per curiam). In *Raines*, the Supreme Court recognized the novelty of the question of legislative standing presented for review and explained why "historical practice" did not support legislative standing because "in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed *injury to official authority or power*." 521 U.S. at 826 (emphasis added). Instead, constitutional challenges to the respective powers of the political branches had been adjudicated primarily in lawsuits in which a private individual had suffered a personal, particularized, and concrete harm. Canvassing the historical record, the Court pointed to numerous instances where, if it had been possible, the President or a member of Congress might have sued to vindicate their respective constitutional powers but never had. *Id.* at 826–28.

The Court concluded that the Judiciary serving as referee between the political branches "is obviously not the regime that has obtained under our Constitution to date." *Id.* at 828. Moreover, the Constitution vests the Article III courts with a restricted role, primarily that of protecting individual rights and liberties, not providing "some amorphous general supervision of the operations of government." *Id.* at 829 (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring)). The Judiciary should hesitate to adjudicate "dispute[s] involving only officials, and the official interests of those, who serve in the branches of the National Government" because such disputes lie "far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement." *Id.* at 833 (Souter, J., concurring in the judgment).

*Raines* also clarified that members of Congress may not circumvent the Judiciary's limited role in interbranch disputes by bringing suit as individuals to vindicate harms to the legislative power. Because the legislative power is vested in Congress as a whole, not in individual representatives and senators, injuries to the legislative power are not injuries to the individual members. Therefore, a suit by members of Congress challenging the Line Item Veto Act could not be maintained in federal court because the "claim of standing [was] based on a loss of political power, not loss of any *private* right, which would make the injury more concrete." *Id.* at 821 (majority opinion) (emphasis added). In subsequent cases, the Supreme Court adhered closely to *Raines* and emphasized that "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019); *Ariz. State Legislature*, 576 U.S. at 802.

After *Raines* decisively closed the door on this circuit's expansive congressional standing decisions,[2] we have consistently denied standing to legislators seeking to sue the

---

[2] We have recognized that *Raines* was the culmination of a long period of tension between this court's approach to standing and the Supreme Court's. *Chenoweth*, 181 F.3d at 115. In the 1970s, this court was "receptive to the idea that we had jurisdiction to hear" complaints brought by members of Congress "seek[ing] judicial relief from allegedly illegal executive actions that impaired the exercise of their power as legislators." *Id.* at 114 (citing *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974), and *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir.) (en banc) (per curiam), *vacated on other grounds*, 444 U.S. 996 (1979)). Even as the Supreme Court clarified that standing was an essential aspect of the separation of powers, *Allen v. Wright*, 468 U.S. 737, 752 (1984), this court continued to analyze standing apart from separation of powers concerns. *See Chenoweth*, 181 F.3d at 114.

Executive Branch to vindicate legislative powers or to enforce the requirements of a statute. *See Chenoweth*, 181 F.3d at 113 (holding that members of Congress lacked standing to challenge an executive order they claimed "denied them their proper role in the legislative process"); *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000) (holding that legislators lacked standing to challenge presidential actions they alleged violated the War Powers Resolution). We recently explained that the Supreme Court's "as well as this court's precedent confirm that *Raines* stands for the proposition that whereas a legislative institution may properly assert an institutional injury, an individual member of that institution generally may not." *McGahn*, 968 F.3d at 775. Individual lawmakers lack standing to assert the official, institutional interests of Congress because of the "mismatch" problem, i.e., congressmen cannot assert injuries on behalf of Congress. *Bethune-Hill*, 139 S. Ct. at 1953; *McGahn*, 968 F.3d at 767.

The only two Supreme Court decisions recognizing legislator standing similarly do not support standing for members of Congress asserting harms to a purportedly personal legislative power. First, Congressman Powell was allowed to sue for backpay in connection with the salary he was denied when the House unlawfully prevented him from taking his seat. *Powell v. McCormack*, 395 U.S. 486 (1969). In *Raines*, the Court contrasted Congressman Powell's injury, which was claimed in a "*private* capacity" and for which there could be standing, with an "*institutional* injury (the diminution of legislative power)" claimed by a member of Congress in an "*official* capacit[y]," for which there was no standing. 521 U.S. at 821 (emphases added). The Constitution guarantees that members of Congress shall be paid. U.S. CONST. art. I, § 6. This is plainly a private and personal right of individual members of Congress, the invasion of which inflicts a paradigmatic Article III injury. *See TransUnion*, 141 S. Ct. at 2204 ("[C]ertain

harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as … monetary harms."). An unpaid salary was not a harm to the legislative power, but rather an injury to Powell's pocketbook.[3] Moreover, in *Powell*, the claim for backpay was not made against the Executive Branch, but the agents of Congress, and therefore did not implicate the same type of conflict between the branches. *See* 395 U.S. at 550.

The only other case recognizing individual legislator standing, *Coleman v. Miller*, 307 U.S. 433 (1939), involved state legislators and has been cabined to its facts. *See Raines*, 521 U.S. at 823–24, 824 n.8 (explaining *Coleman*'s limited application and noting that the case involved state legislators, which would not raise the same separation of powers concerns as suits between the federal political branches); *Bethune-Hill*, 139 S. Ct. at 1954 (repeating *Raines*'s characterization of *Coleman*).

---

[3] The panel majority takes from *Powell* that some official harms may be personal. *Maloney*, 984 F.3d at 65–66. It is true that Powell's monetary harms flowed from his election as a congressman. That simply means that in narrow circumstances a private harm, like the denial of a salary, may result from an official position. *See, e.g.*, *Humphrey's Executor v. United States*, 295 U.S. 602, 618 (1935) (deciding the extent to which Congress may insulate a commissioner of a so-called independent agency from presidential removal in the context of a suit in the Court of Claims for the unpaid salary of a fired executive official). *Powell* cannot be read to recognize a category of personal legislative injuries because Powell's injuries were not to his exercise of legislative power. Indeed, *Raines* recognized that *Coleman v. Miller* is the only case upholding "standing for legislators (albeit *state* legislators) claiming an institutional injury," further reinforcing that *Powell* is not a case about institutional or official harms. *Raines*, 521 U.S. at 821.

10

\* \* \*

A legislator may have standing in the federal courts only if his affected "interest … [is] of a personal and not of an official nature." *Braxton Cnty. Ct. v. West Virginia ex rel. State Tax Comm'rs*, 208 U.S. 192, 197 (1908). Injuries to the official interests of a member of Congress, like other harms to institutional legislative power, lie outside the traditional understanding of the "Cases" and "Controversies" cognizable by the Article III courts.

## III.

The foregoing provides the constitutional backdrop for assessing the panel majority's conclusion that Section 2954 grants members of Congress a personal right to information from executive branch agencies that is no different from any other private informational injury that may be vindicated in court. *Maloney*, 984 F.3d at 64. The investigative power of Congress is not and cannot be personal, because it is "justified solely as an adjunct to the legislative process." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (cleaned up).

Section 2954 cannot create a personal right to information for the Members, because Congress cannot constitutionally convert its institutional legislative power to investigate into a personal right of its members. Nor can the official and institutional injuries alleged by the Members under Section 2954 be analogized to the private informational injuries under statutes such as the Freedom of Information Act ("FOIA") and the Federal Advisory Committee Act ("FACA"). Therefore, the denial of information under Section 2954 does not provide members of Congress with the type of concrete and particularized injury cognizable by the Article III courts.

11

A.

The panel majority frames this case generically as simply a question of whether the denial of information to which a "person" or "requester" is statutorily entitled constitutes an injury sufficient to invoke Article III jurisdiction. It concludes a concrete injury exists because "Section 2954's plain terms invest the informational right in legislators, not the legislature. Which makes the deprivation of requested information an injury personal to the requesting legislators." *Maloney*, 984 F.3d at 67. But framing the case this way assumes the most important question—whether a statute can constitutionally grant members of Congress a *personal* right, enforceable in federal court, to information from the Executive Branch. Section 2954 cannot create such a personal right because any power to investigate belongs to the House and Senate as part of their institutional legislative powers, and Congress cannot delegate these institutional powers in a way that creates rights in individual members.

Congress' power to investigate the Executive Branch derives solely from the legislative power. As the Supreme Court recently reiterated, "Congress has no enumerated constitutional power to conduct investigations[,] … but we have held that each House has power 'to secure needed information' in order to legislate." *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)). The panel's so-called informational right is merely an "auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. Just as the legislative power is vested in Congress, U.S. CONST. art. I, § 1, the auxiliary power to investigate also belongs to *Congress* and is inextricably linked to the need to gather information in order to "legislate 'wisely or effectively.'" *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 175). Perhaps in recognition of these principles, the

Members pleaded that the informational right in Section 2954 was "congressionally-delegated" and that they were exercising necessary "congressional" oversight.

The power to legislate, however, "is not personal to the legislator," so "the legislator has no personal right to it." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). Injuries to "political power" are not judicially cognizable because the legislator exercises legislative power "as trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S. at 821; *see also United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body."). While members of course undertake myriad lawmaking functions, legislators have no personal right to the legislative power and therefore have no personal right to the incidents of that power, such as investigation and oversight.[4]

---

[4] The principle that a legislator has no personal right to the legislative power follows from the text and structure of the Constitution, which confers no power on representatives and senators that may be exercised individually. The Constitution recognizes individual members primarily with regard to their selection and compensation. *See* U.S. CONST. art. I, § 2, cl. 1; *id.* § 3, cl. 1; *id.* § 6, cl. 1. The Constitution vests the legislative power in Congress as a whole. U.S. CONST. art. I, § 1; *see also* Neomi Rao, *Why Congress Matters: The Collective Congress in the Structural Constitution*, 70 FLA. L. REV. 1, 71 (2018) ("Congress can take no *binding* action against the other branches except through legislation or through impeachment and removal."). Members share a part of the legislative power and exercise an important public trust, but the legislative power does not belong to them individually.

Because investigation is an institutional prerogative and exists only insofar as it is a legitimate adjunct to the legislative power, Section 2954 cannot confer an informational right on individual members to sue the Executive Branch in federal court. The Supreme Court has consistently invalidated statutes that attempt to reallocate the legislative power to Congress' constituent parts. *See* John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673, 715–18 (1997) (discussing these cases).

For instance, a single house of Congress cannot exercise the legislative power because legislative power must be exercised through bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 955 (1983) (explaining that when the Constitution permits "either House of Congress to act alone," it "narrowly and precisely define[s] the procedure for such action"). The prohibition, recognized in *Chadha*, against Congress reassigning legislative power to a single house applies *a fortiori* to reassigning legislative powers to individual members of Congress. Similarly, Congress cannot assign a subset of its members the power to veto decisions made by an agency, because "Congress may not delegate the power to legislate to its own agents or to its own [m]embers." *Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 275 (1991). Indeed, "[i]f Congress were free to delegate its policymaking authority to one of its components, or to one of its agents, it would be able to evade the carefully crafted restraints spelled out in the Constitution." *Bowsher v. Synar*, 478 U.S. 714, 755 (1986) (Stevens, J., concurring in the judgment) (cleaned up).

Furthermore, the Court has specifically held that Congress cannot by statute convert a "generalized grievance" about government into a judicially cognizable personal injury. *See Lujan*, 504 U.S. at 573–76 (discussing cases). In *Lujan*, the

Court reviewed a citizen-suit provision and recognized that the relevant question was "whether the public interest in proper administration of the laws … can be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue." *Id.* at 576–77. The Court answered that question with a resounding *no*: "To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Id.* at 577 (quoting U.S. CONST. art. II, § 3).

Interpreting Section 2954 to confer standing on individual members of Congress would raise parallel constitutional problems because it would allow Congress to convert the collective legislative power, and the accompanying power to investigate, into an "individual right" of lawmakers that could be vindicated in the federal courts. To allow such actions "would enable the courts, with the permission of Congress, to assume a position of authority over the governmental acts of another and co-equal department, and to become virtually continuing monitors of the wisdom and soundness of Executive action. We have always rejected that vision of our role." *Id.* (cleaned up).

Just as Congress cannot transfer bits of the President's executive power to the general public, it similarly cannot transfer bits of Congress' legislative power to individual legislators. Statutory say-so is insufficient to expand the powers of individual legislators and the reach of the federal courts.

The unsuitability of judicial review is further highlighted by the fact that Section 2954 accomplishes by statute what would ordinarily be addressed by the internal rules or orders of the House and Senate, which frequently assign investigative authority to committees and subcommittees. *See* U.S. CONST. art. I, § 5, cl. 2. Such rules, however, do not create any personal rights in members enforceable in federal court. Internal allocations of congressional power generally cannot be vindicated in court by any legislator or groups of legislators. *See Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) (per curiam) (concluding that the question of whether the House observed its own rules was political and therefore nonjusticiable); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1181 (D.C. Cir. 1983) (Bork, J., concurring in the judgment) ("[F]ederal courts should firmly refuse to enter upon the wholly inappropriate task of ensuring absolute equity in Congress's legislative procedures. It is absurd to think that courts should purge the political branches of politics."); *id.* at 1176 (majority opinion) (calling adjudication of such disputes a "startlingly unattractive idea") (cleaned up); *Chadha*, 462 U.S. at 955 n.21 (emphasizing that the rulemaking power "only empowers Congress to bind itself"). Judicial review of House and Senate rules of proceeding would likely exceed the Article III "judicial Power" and encroach on the independence of Congress. This further suggests that Congress lacks the authority to vest individual members with judicially enforceable investigative rights that would ordinarily be allocated by non-reviewable internal rules.[5]

---

[5] A further constitutional difficulty is that each house of Congress has an independent power to make internal rules of proceeding. U.S. CONST. art. I, § 5. Section 2954, however, purports to allocate (or delegate) some investigative authority to a subgroup of committee members in both the House and Senate. If Congress by statute may allocate power to individual representatives and senators, that could

I would also note that there is no evidence that Congress created individual member standing when enacting Section 2954. Given the total absence of any historical precedent for such lawsuits in 1928, the establishment of a judicially cognizable informational right would have been an exceptional expansion of federal court jurisdiction to decide informational disputes between Congress and the Executive. In light of the novelty of the statute and the fact that it makes no mention of a cause of action or of standing for individual members, we should not readily assume Section 2954 creates the type of right and injury that is cognizable by the federal courts. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not … hide elephants in mouseholes."); *FEC v. Akins*, 524 U.S. 11, 30 (1998) (Scalia, J., dissenting) ("Because this provision is so extraordinary, we should be particularly careful not to expand it beyond its fair meaning.").

The Members' complaint and the panel majority's reasoning recognize that the "informational right" in Section 2954 pertains to the official, legislative powers of members. *See Maloney*, 984 F.3d at 64 ("[T]he Requesters sought the information covered by Section 2954 in this case to inform and equip them personally to fulfill their *professional duties as Committee members*.") (emphasis added). What the panel majority fails to explain, however, is how Congress may convert the institutional legislative power of investigation into a personal right of individual legislators.

Congress cannot self-delegate a piece of the legislative power to individual representatives and senators in a way that

---

frustrate the independent constitutional power of each house to make its own rules, because one house of Congress would be unable to promulgate a rule of proceeding contrary to a statute without the consent of the other house and the President.

creates judicially cognizable rights. Section 2954 should not be read to create standing for members of Congress asserting their investigative, i.e., legislative, powers when such an interpretation would contravene the Constitution's separation of powers.

B.

The panel's analogy to private informational injuries under FOIA and FACA is similarly inapposite. Those statutes create certain informational rights against the government, and individuals may sue in federal court to challenge an agency's failure to provide information to which the person is entitled. *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. app. 2 § 10(b). The Supreme Court and this court have held that the deprivation of such information can constitute a private, particularized, and concrete injury that gives rise to standing. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449–50 (1989); *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017).

The informational right created by Section 2954 is different. FOIA and FACA create a private right to information to be used for any purpose. By contrast, Section 2954 gives legislators a right to information specifically for legislating, as evidenced by the fact that information requests must "relat[e] to any matter within the jurisdiction of the committee." 5 U.S.C. § 2954. Only by glossing over this material distinction can the majority avoid the salient constitutional questions. *See* Concurring Op. 3–6.

While in the context of private plaintiffs the court properly looks to whether the withholding of information has harmed the plaintiff "in a personal and individual way," *Spokeo*, 578 U.S. at 339, the inquiry is entirely different for members of

18

Congress seeking to exercise their legislative powers.[6] The panel states that "[a] personal injury … refers to an injury

[6] Members of Congress sometimes use FOIA to seek information from the Executive Branch, and there are a few cases in which they have litigated an agency's failure to release information under FOIA. But these cases have recognized a distinction between individual informational rights held by private citizens and the official prerogatives of members of Congress. FOIA suggests that Congress' power to investigate and to seek information from the Executive is distinct from and perhaps greater than private citizens' FOIA rights. *See* 5 U.S.C. § 552(d) ("This section is not authority to withhold information from Congress."); *see also Murphy v. Dep't of the Army*, 613 F.2d 1151, 1157 (D.C. Cir. 1979) (explaining that "when a document is released for official congressional purposes, a waiver of [a] FOIA exemption is not implied").

The courts have struggled, however, with distinguishing FOIA requests made by a member in his or her private capacity and those made in an official capacity. *See Leach v. Resol. Tr. Corp.*, 860 F. Supp. 868, 880 (D.D.C. 1994) (refusing to decide whether a member could assert the rights of Congress as an institution and dismissing the case without prejudice to the representative's "right to assert any claims he might have as a member of the public"). We have, for instance, distinguished a FOIA request by a representative made as a private citizen from his receipt of that same information as a member of a committee. *See Aspin v. Dep't of Def.*, 491 F.2d 24, 26 & n.14 (D.C. Cir. 1973). In *EPA v. Mink*, the Supreme Court treated a FOIA request by 33 representatives as a request made by private citizens. *See* 410 U.S. 73, 75 (1973). It is notable that the district court in *Mink* dismissed the action "insofar as plaintiffs seek to maintain the action in their capacity as [m]embers of Congress on the ground that plaintiffs have failed to present a justiciable [C]ase or [C]ontroversy and they may not maintain the action in that capacity by reason of the Separation of Powers provisions of the Constitution." *Mink v. EPA*, No. 1614-71, 1971 U.S. Dist. LEXIS 15238 at *1–2 (D.D.C. Aug. 27, 1971). The D.C. Circuit did not reach that issue, so it was not before the Supreme Court. *Mink*, 410 U.S. at 73 n.2.

suffered directly by the individual legislators to a right that they themselves individually hold." *Maloney*, 984 F.3d at 62. But legislators have no individual right to information from the Executive Branch in the exercise of their official legislative duties. Rather, as already discussed, any investigative rights a member has may be exercised only as part of the institutional, legislative power of the House or the Senate.

When members make a request under Section 2954, they are exercising their official, congressional responsibilities and therefore are not acting as private individuals. In other contexts, the Supreme Court has rebuffed the claim that members of Congress act as individuals when exercising congressional responsibilities. For example, even when a statute designated members of Congress as serving on a Board "in their individual capacities" the Court noted this fact "does not prevent this group of officials from qualifying as a congressional agent exercising federal authority for separation-of-powers purposes." *Metro. Washington Airports Auth.*, 501 U.S. at 267. Because the Members were exercising "congressional responsibilities," it "belie[d] the *ipse dixit* that the Board members will act in their individual capacities." *Id.* (cleaned up). Section 2954 limits information requests to official congressional responsibilities, namely those within the jurisdiction of the Committee, which belies the panel

---

The few decisions allowing members to bring suit under FOIA have generally proceeded as though the requests for information were made by private individuals. None of these decisions have held that members of Congress may sue to vindicate personal informational injuries to the exercise of their official legislative powers.

majority's claim that members have a personal right to the information.[7]

Characterizing the exercise of congressional responsibilities as personal and individual only further unmoors this Circuit's law from *Raines*, *Chenoweth*, *Campbell*, and other congressional standing cases. Members of Congress acting in their official capacity are not like private parties. As we noted in *Chenoweth*, the idea that "congressional and private plaintiffs should be treated alike for the purpose of determining their standing" is "untenable" after the Supreme Court's decision in *Raines*. 181 F.3d at 114–15. Analogies to private injuries of private persons do not bear on our inquiry in congressional standing cases where the branches are suing each other. *See, e.g.*, *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 150 (1951) (Frankfurter, J., concurring) ("[A] court will not decide a question unless … the *relationship between the parties* [is] such that judicial determination is consonant with what was, generally speaking, the business of

---

[7] The panel majority maintains that the Members' informational right does not run with their Committee seats and therefore must be a personal injury, similar to Congressman Powell's claim for loss of salary. *Maloney*, 984 F.3d at 65–66. But Congressman Powell would have been entitled to backpay even after leaving office because he was entitled to the salary in his "private capacity." *Raines*, 521 U.S. at 821. By contrast, upon leaving office, the Members here would not be entitled to information under Section 2954, as the panel majority recognizes. *Maloney*, 984 F.3d at 66 ("If one of the Requesters were to leave the Committee, the injury sued upon would end with her service."). This difference shows the flaw in the panel majority's analogy. Unlike Congressman Powell, the Members' claimed injury is to official powers because it is wholly dependent upon the Members' current service in the House (and on a particular committee). An injury cannot be "personal" and "individual" if it is extinguished when a member leaves office.

the Colonial courts and the courts of Westminster when the Constitution was framed.") (emphasis added).

The analogy between Section 2954 and private informational harms fails because members of Congress are not acting as private persons when exercising official, legislative powers, such as investigating the Executive Branch.

\* \* \*

Section 2954 cannot create a so-called "informational right" in members of Congress because the investigative powers of Congress belong to the House and the Senate as an adjunct of their legislative powers and may not be delegated to individual members. Interpreting Section 2954 to allow congressional standing in a suit against an executive branch agency strays far afield of the historical understanding of the "Cases" and "Controversies" cognizable by the Article III courts.

IV.

Within the Constitution's carefully calibrated structure of separated powers, the expansion of one federal power inevitably distorts the others. The panel's assertion of jurisdiction to decide this lawsuit not only exceeds the Article III limits on the federal courts, but it also implicates additional constitutional concerns that cannot be swept under the rug. *Contra Maloney*, 984 F.3d at 69 ("Nor does this case implicate any potentially special circumstances."). The Supreme Court has cautioned that courts must scrutinize novel attempts by Congress to enlist the courts in disputes against the Executive. *See Mazars*, 140 S. Ct. at 2033–34 (rebutting the conclusion of the D.C. Circuit that a subpoena for the President's papers presented "no direct interbranch dispute"); *id.* at 2036 (concluding that the courts of appeal "did not take adequate

account" of the "special concerns regarding the separation of powers"). In that vein, I highlight some of the constitutional concerns implicated by allowing standing to members of Congress in informational disputes with executive agencies.

First, this case pits Congress and the President against each other. Although the panel majority places weight on the fact that this is "not a suit against the President or a claim for information from him," *Maloney*, 984 F.3d at 69, the Members requested information about the former President's lease with GSA and potential conflicts of interest. And while this lawsuit is nominally between members of Congress and the GSA, these parties are simply subcomponents of Congress and the Executive. An investigation of the President by Congress may present the most profound separation of powers concerns, but the balance of power may be unsettled even in a less direct "clash between rival branches of government over records of intense political interest for all involved." *Mazars*, 140 S. Ct. at 2034.

Second, allowing standing for members of Congress to sue the Executive for information would substantially and unnecessarily change the "'established practice' of the political branches." *Id.* (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)). Committees, subcommittees, and individual members of Congress frequently request information or documents from executive branch agencies. Such requests are ordinarily dealt with through negotiation and the give and take between the branches. *See id.* at 2029. Indeed, despite the thousands of requests by members of Congress that sally forth each year to executive branch agencies and officials, plaintiffs can identify no case, and I am aware of none, allowing a member of Congress to sue an executive agency for the failure

to release documents pursuant to such a request.[8] If individual members of Congress can bring such lawsuits in the federal courts, "[i]nstead of negotiating over information requests, Congress could simply walk away from the bargaining table and compel compliance in court." *Mazars*, 140 S. Ct. at 2034. Nothing in the Constitution's text or structure or our historical practice suggests that members of Congress can resort to the courts in order to shake documents loose from the Executive Branch.

Moreover, in the disputes between the political branches Congress is already vested with substantial powers to pressure the Executive to disclose information. Congress may conduct oversight hearings, drawing attention to problems of administration. Congress may reduce or eliminate agency funding, or it may create or abolish programs. Congress may eliminate the statutory authority of an agency or mandate specific agency actions by statute. Congress may impeach and remove executive branch officials and may create new offices within the Executive Branch. The existence of these and other formidable powers strongly weighs against judicial review of ordinary informational disputes. Having delegated substantial authority and discretion to agencies, members of Congress understandably seek new ways to hold those agencies accountable. But Congress may provide accountability only

---

[8] That includes requests under Section 2954, which has never been successfully invoked in litigation since its passage in 1928. One district court, in a decision later vacated as moot, allowed such a suit to go forward, *Waxman v. Evans*, 2002 WL 32377615 (C.D. Cal. Jan. 18, 2002), *rev'd and vacated*, 52 F. App'x 84 (9th Cir. 2002). The only other case to consider the question of standing under Section 2954 held that the legislators had no standing to sue. *Waxman v. Thompson*, 2006 WL 8432224, at *6–12 (C.D. Cal. July 24, 2006).

through the exercise of its legislative powers.[9] It cannot dragoon the federal courts into its investigations.

Third, finding disputes under Section 2954 to be justiciable encourages congressional aggrandizement because Congress may deputize small subgroups of members to conduct investigations, not through the traditional legislative process, but through the federal courts. Empowered cabals may thus take aim at executive branch agencies.[10] Ordinary political squabbling will now entitle members of Congress to proceed to court. The Executive Branch then must face not one political rival, Congress, but countless combinations of lawmakers, as Section 2954 requires only seven members of a 45-person House committee or five members of a 14-person Senate committee. Furthermore, the panel majority's reasoning provides no limit to Congress' ability to assign such legislative powers to even smaller groups or a single member. Consequently, members of Congress may enlist the courts in

---

[9] The Constitution vests the President with all executive power and therefore responsibility and accountability for the execution of the laws. U.S. CONST. art. II, § 1. Agency accountability to Congress exists only as an incident of the legislative power.

[10] The Framers of the Constitution frequently expressed concern about legislation by "cabal" or "junto," by which small self-interested groups could corrupt the legislative power. *See* Rao, *supra*, at 29–30; *see also* JAMES MADISON, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787 376–77 (Gaillard Hunt & James Brown Scott eds., 1987) (warning of dangers by a "juncto" if a small number of legislators were permitted to govern); THE FEDERALIST NO. 55, at 288 (James Madison) (George W. Carey & James McClellan eds., 2001) ("[I]n all cases, a certain number at least seems to be necessary … to guard against too easy a combination for improper purposes.").

their political conflicts and strategically threaten executive agencies with protracted litigation.

Finally, dispersing the investigative power to small groups of representatives or senators who may then bring lawsuits allows Congress to duck responsibility for oversight and investigations. While the House and the Senate regularly delegate authority to committees and subcommittees, the hierarchical structure of those committees creates a certain type of accountability in the leadership of the House and Senate. If Section 2954 creates standing, a few representatives or senators on their respective committees need not persuade the chairman or a committee majority; instead they need just a few like-minded and zealous members willing to go to court to obtain information from the Executive. Allowing standing could be "ruinous" and "[j]udicial enforcement of requests under § 2954 will allow the minority party (or even an ideological fringe of the minority party) to distract and harass Executive agencies and their most senior officials." *Maloney*, 984 F.3d at 75 (Ginsburg, J., dissenting). The panel's decision not only empowers small groups of lawmakers, it also frees House and Senate leadership from taking responsibility for their more fractious members or from being tasked with negotiating the requests of such members with the Executive Branch.

The legislative power often expands in imperceptible ways. As James Madison warned, Congress ultimately has the upper hand and can "mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." THE FEDERALIST NO. 48, at 257 (James Madison) (George W. Carey & James McClellan eds., 2001). Allowing standing under Section 2954 both empowers individual legislators and expands the reach of congressional investigations, while at the same time undermining Congress' responsibility and accountability for incursions against the

Executive. Such aggrandizement without accountability contravenes the Constitution's vesting of the legislative, executive, and judicial powers in three separate and distinct departments of the federal government.

\* \* \*

By holding that Section 2954 creates an informational right that may give rise to standing for members of Congress against the Executive Branch, this court has conscripted the Judiciary in an inter-branch dispute far afield of the traditional domain of the Article III courts. For the foregoing reasons, I respectfully dissent from the denial of rehearing en banc.

GINSBURG, *Senior Circuit Judge*, statement regarding the court's denial of *en banc* review:

Today the court declines to rehear a panel decision holding a nearly century-old statute, 5 U.S.C. § 2954, never before successfully invoked in court, grants any seven members of the House Oversight Committee a personal right to investigate the Executive – a right they have standing to enforce in court. Until now, before going to court, Committee Members seeking to force an Executive Branch official to produce documents had to get the full Committee to approve and, if that was not enough, get the House to issue a subpoena, which is enforceable in court. *See Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764-66 (D.C. Cir. 2020) (en banc). In the panel majority's view, that is not, and for a century has not been, necessary: When seven Members of the Committee request documents pursuant to this statute, they are acting – oxymoronically – on their own behalf "to inform and equip them *personally* to fulfill their professional duties *as Committee members*." *Maloney v. Murphy*, 984 F.3d 50, 64 (D.C. Cir. 2020) (emphasis added). Therefore, the plaintiff-Members here each suffered a *personal* injury when the General Services Administration limited his or her ability to peruse Executive Branch files for any "conflict of interest, mismanagement, or irregularity in federal contracting" and hence to recommend remedial legislation.

As explained in my dissent, *Id.* at 70-76, the panel's decision flies in the face of the Supreme Court's clear teaching that "individual members lack standing to assert the institutional interests of a legislature." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950, 1953-54 (2019) (citing *Raines v. Byrd*, 521 U.S. 811, 829 (1997)). The upshot of this judicial affrontery is that a few members of the Oversight Committee can wield the investigative powers of the House and prevent a majority of the Committee and of the House from blocking an ill-advised lawsuit. As the district

court said, it will subject the Executive to "the caprice of a restless minority of Members," *Cummings v. Murphy*, 321 F. Supp. 3d 92, 115 (D.D.C. 2018), who may represent no more than "an ideological fringe of the minority party." *Maloney*, 984 F.3d at 76 (Ginsburg, J., dissenting). This is sure to have ruinous consequences for the orderly functioning of government; it will require the courts to referee the daily disagreements, sure to multiply under this ruling, that arise over the production of documents to the Congress. For these reasons, I believe the *en banc* court should vacate the panel's opinion and affirm the judgment of the district court rather than burden the Supreme Court with the obvious necessity of doing so.